## CAMPBELL vs. THE STATE.

1. A witness may be asked, and may state, his " opinion as to the time of day " when an event occurred.
2. So, also, he may state his opinion as to the length of time which elapsed between the happening of two events.
3. Evidence that the shoes taken from the feet of the horse ridden by the prisoner on the morning of the murder, " seemed to fit in every particular " the tracks found near the body of the deceased, is admissible against him.
4. When the evidence against the prisoner is entirely circumstantial, his conduct, his situation and locality, as affording him opportunities of knowing when the deceased left the school on the morning of the murder when she was last seen in life, and whether his being in that place at that particular time was or was not an unusual occurrence with him, are all circumstances which, though weak in themselves, are not so foreign from the main inquiry as to justify their exclusion from the jury as irrelevant.

Campbell v. The State.

5. On the trial of a prisoner indicted for murder, the evidence against him being circumstantial, it was shown that, on the second morning after the murder, he was seen coming from the direction of a house where two wo men, mother and daughter, resided, the daughter being an unmarried woman who had two children; that he had frequently been seen there before, at one time shaving and changing his clothes; that, on the evening of the same day, witness went to the house, and found the daughter alone, washing a man's shirt, which had splotches or stains on the bosom and cuff of the right sleeve; that " said splotches looked more like the stains from chesnut timber than anything else witness could compare them to;" that no man lived in the house, and witness knew no man in that neigh. borhood who wore so fine a shirt. The witness was asked, whether any person inquired of him if he knew what would take stains out of shirts; to which he replied, that the question was asked him by the young woman, and gave his answer to it. The prisoner objected both to the question and answer, and also moved to exclude from the jury all that the witness had said about the shirt and the stains on it, but the court refused to do so. The young woman was afterwards introduced as a witness for the defence, and testified, on cross-examination, that the prisoner stayed at their house on the second night after the murder, that he left a shirt with her to be washed, and that she washed it. *Held*, that the evidence objected to by the prisoner was properly admitted.

6 and 7. A conviction for libel in another State does not disqualify a witness in this State; nor is the record of conviction admissible in evidence to discredit him.

8. It is no objection either to the competency or credibility of a witness, that he is subject to fits of mental derangement, if it appears that he is sane at the time he is offered.

9. When the competency of a witness is attacked on the ground of insanity, and the court decides in favor of his sanity, the evidence adduced to the court cannot be submitted to the jury to affect his credibility.

10. When evidence in adduced to the court on a preliminary examination touching the incompetency of a witness by reason of insanity, the Appellate Court will presume that the judge was not influenced by any evidence which he ought not to have considered.

11. The prisoner's confession that he had assisted to get another man's son out of jail, who would aid him in escaping, and the fact that this man had come twice to the jail where the prisoner was confined, are admissible evidence against him.

12. The declarations of the prisoner cannot be given in evidence in his favor,· even for the avowed purpose of bringing out the reply of the witness to whom they were made, unless they constitute a part of a conversation drawn out in evidence by the State.

13. When a witness has been cross-examined respecting his former statements, with a view of impeaching him, he may be asked on re-examination in chief his motive in making those statements.

14. A party may ask his own witness whether he has not previously made statements inconsistent with what he has just stated on the trial.

15. A witness may be questioned, on cross-examination, as to his habits of drinking.

16. After the State has proved the appearance of the prisoner on the evening of the day of the murder and on the following day, the prisoner cannot be allowed to prove that, on the third day thereafter, when informed of the murder, he appeared surprised; nor can he be allowed to prove that he seemed astonished, when informed that he was suspected of the murder.

17. When a witness is introduced for the purpose of impeaching another by proof of his general character, and, on cross-examination, testifies, that public rumor imputed to the impeached witness " a bad moral character as to drinking, fighting, murder, shooting at men, and certain publications, reputed false, in his newspaper," he cannot be asked on re-examination in chief, 'what other moral delinquencies public rumor attributed to him;' nor, 'what rumor said in regard to those publications;' nor, 'whether he did not know of his own knowledge, that they were false.'

18. The general character of a witness at his place of residence, cannot be proved by evidence of what rumor said of it before he came to that place.

19. Evidence that several indictments for libel are pending against a witness, is not admissible for the purpose of impeaching him.

20. A letter written for the prisioner by the witness, while they were in jail together, is not admissible evidence for the prisoner, either as original testimony of its contents, or for the purpose of impeaching the witness.

21. Any evidence giving a history of the prisoner's acts on the day of the murder, is relevant, and admissible against him.

22. The prisoner's witnesses may be questioned, on cross-examination, as to their relations with the prisoner,—whether they were on terms of friendly intimacy— their means of knowing the facts to which they testify, and as to any liens or prejudices which might influence them.

23. An unmarried woman may be asked, on cross-examination, although she might refuse to answer, whether or not she has any children.

24. The county surveyor, a witness for the prisoner, illustrated his evidence with a diagram which he had himself made, showing the relative situation and distances from each other of several places near the scene of the murder. The diagram was introduced without objection from the State, and the witness was cross-examined on it. *Held*, that it was discretionary with the court to allow the jury to take it with them on their retirement, and its exclusion from them was not revisable on error.

25. A witness for the State, who, on cross-examination, testifies that he has taken an active part in the prosecution, and that he cherishes unfriendly feelings towards the prisoner, may be asked, on re-examination, " whether his feelings towards the prisoner are such as to desire to see an innocent man convicted."

26. The individual opinion of a witness, founded on rumor respecting the guilt of another witness of the crime of murder, is not admissible for the purpose of impeaching the latter.

ERROR to the Circuit Court of DeKalb.

Tried before the Hon. ROBERT DOUGHERTY.

JAMES H. CAMPBELL, the plaintiff in error, was indicted in the Circuit Court of Cherokee, at the Spring term thereof, 1851, for the murder of Martha Garrett. The venue was changed, on his application, to the County of DeKalb, where a special term was ordered to be held, commencing on the fourteenth day of June, 1852, for his trial; at which time he was tried and convicted, the trial lasting two weeks, and was sentenced by the court, on the finding of the jury, to the penitentiary for life.

On the trial, a bill of exceptions was signed and sealed by the presiding judge, which presents a number of exceptions to the rulings of the court in the admission and rejection of testimony, which are now assigned for error. For a better understanding of the case, it is proper to give a brief synopsis of the proof, about which there appears to have been no controversy, explanatory of the circumstances and condition of the deceased at the time she was found.

It appears that, on Sunday, the third day of December, 1850, the deceased, aged twelve years and thirteen days, left the house of her mother, who was a widow lady, residing three fourths of a mile from Centre, in which village is located the court-house of Cherokee County, to attend the Sabbath school which was then, and had been for several months previously, held in said court-house, and of which she had been a punctual attendant. On the next morning, her body was found some forty yards from the road leading from said village to her mother's, lying in a dry branch; her throat cut; two severe wounds on the head; her person violated, and one of her hips dislocated; her bible, hymn-book and handkerchief lying within about eighteen inches of her body. The last time she was seen in life, was upon the adjournment of the Sabbath school, about 11 o'clock, A. M., when she started home, making a pause of three or four minutes at the house of Mrs. Martin. The distance from the court-house to the place where the body was found, was about nine hundred yards.

The evidence tending to connect the prisoner with the murder, was circumstantial, and consisted also of confessions of guilt

made by him to one Edward Stiff. It appeared that, the evening before the murder, the prisoner had had a conversation with one West, about the purchase of a watch; that it was agreed between them, that West should bring the watch to him the next morning, (Sunday,) as he proposed going on that day to Gunter's Landing, to attend the races, and he wished to wager the watch on a horse-race; that West failed to bring the watch, and the prisoner spoke to several persons the next morning about his intention to go for it to Mrs. Covington's, where West boarded, and who resided about a mile from the village of Centre.

It appears that, at the time when the Sabbath school adjourned, the prisoner was at a tavern in the village, kept by one Asa Allen, near enough to observe the adjournment; that, some short time after the adjournment of the school, he borrowed a horse from one Joseph Street, and left the tavern about 11 o'clock, but the testimony was conflicting as to the precise time; that he went to Mrs. Covington's, remaining there about five minutes; but there was a conflict in the evidence, as to the time of his departure from Centre, the length of time he was absent, and the exact time of his return; that horse-tracks were found, diverging from the road from Centre to Mrs. Covington's, and extending in the direction of the place where the body was found, and the evidence conduced to prove that these were the tracks of the horse ridden that morning by the prisoner. It was also shown that the water in a pool, situated between the place where the body was found and Mrs. Covington's, was discolored with blood on the third day after the murder, and that the heel of the defendant's boot corresponded in size with tracks made near the edge of the pool.

A large number of exceptions are set out in the record in relation to the admission and exclusion of evidence; but, as most of them are noticed at length in the opinion of the court, it is not deemed necessary to recapitulate them in this place.

Mrs. Shackleford, a witness for the defence, testified, that her husband kept a tavern in Centre; that Campbell was one of their boarders; that she had his washing done, and knew the number of his drawers; that he ate dinner at their house on the Sunday of the murder; that they sat down to dinner about 12 o'clock; that Campbell was at home some fifteen minutes before

dinner was ready; that she saw his shirt bosom, and it was the same one he had on the Saturday evening before; that she saw no blood or other stain on the bosom. On cross-examination of this witness, the State's counsel asked her the following questions : Whether she had any drawers in defendant's room? Whether she had made any vest or shirts for him? Whether she had ever darned or mended any of his clothes during his stay at her house as a boarder; to which she answered, that she did, as she had also done for other boarders. To each one of these questions the prisoner, by his counsel, objected; his objection was overruled, and he excepted.

Miss Anthony, a witness for the defendant, testified, that she saw him, on the morning of the murder, get the horse ridden by him that day, and start out of town in the direction of Mrs. Covington's, and that it was then some time after 11 o'clock.— On cross-examination by the State, she was asked the following questions : "Do you not recollect where you first met the defendant?" "Campbell called there, I suppose?" "Where did you next meet him, the defendant?" "Do you recollect where you met the defendant the next time?" "Was the defendant, Campbell, a frequent visitor at Mr. Weir's house?" "Did you ever go to any assembly, ball, church or show, in company with the defendant, Campbell?" To this last question the witness answered : "Mr. Campbell went to preaching with me once or twice." "Was it before the murder of the deceased that you went to preaching with the defendant?" "Had not Campbell made propositions of marriage to you before the death of Miss Garrett?" "Has he not made propositions of marriage to you since the death of Miss Garrett?" To each one of these questions, and to the answer above stated, the prisoner objected; his objection was overruled, and he excepted. "The State then proved by the witness, that she was a witness before the grand jury by whom the indictment was found; that after she had been in the grand jury room, before sundown on the same day, she was sitting in Mr. Weir's house; that Mrs. Weir was absent from home, at some place in the village; that the front door of the house, which was on the street, was closed, and the back door was open; that some members of the grand jury knocked at the front door, and then went in. The State then offered to prove by the witness that

5

the said grand jurors, on getting into the room, found the defendant sitting in the room with her alone. To this the defendant objected ; his objection was overruled, and he excepted. The witness answered, that Campbell was sitting in the room, conversing with her at the time."

Jane Matheny, a witness for the prisoner, testified, on cross-examination, " that she had known Campbell for some ten or eleven years, and that she had never been married ; that since the prisoner returned from Mexico, has visited witness every week or so; never has stayed away longer than seven weeks. The State then asked her : " Have you any children?" to which defendant objected ; his objection was overruled, and he excepted ; the witness answered, that she had two children.—— The State then asked her, where her mother was on the day that Coggins swore she had shown him a shirt. To this question defendant objected, his objection was overruled, and he excepted. The testimony of the said Jane Matheny conduced to prove, that the defendant had stayed all night at her mother's, with whom the witness then and now lives, on Monday night after the murder ; that he left there Tuesday morning ; that he left a shirt to be washed, and that she washed it. The attorney for the State asked her, what she was doing the day after Campbell left? To this question defendant objected, his objection was overruled, the witness required to answer, and defendant excepted. She was then asked by the State's counsel, " Where did your mother go that day ?" To this question defendant objected, his objection was overruled, and he excepted. Witness was asked by the counsel for the State, " Did you not have a conversation with Mr. Ryan, a few weeks after you moved to Frank Hail's, in which you said, " Campbell has neglected me ; if Campbell don't mind, I will tell all I know about it." Question objected to by defendant ; objection overruled ; witness required to answer, and defendant excepted."

" James Gaines was introduced by defendant to prove the general character of said Edward Stiff; proved it bad ; was asked, on cross-examination, upon what he based his opinion, and what Stiff had done to give him a bad character ; to which defendant objected, his objection was overruled, and he excepted. Witness said, he had heard men say that when Stiff was interested, they would not belive him on oath. He was asked by the

State, who he had heard say so, and where, and when. To the question defendant objected, objection overruled, and defendant excepted.

" Henry Cole, a witness for defendant, before he was examined in chief, was sworn to answer questions ; and was asked by the State, ' whether he had not made revelations to one of the counsel of the defendant, as to what he would swear.' The question objected to by defendant, objection overruled, and defendant excepted. After the said Henry Cole was put on his examination before the jury, he was asked the same question; defendant again objected, was overruled, and excepted."

" One Counts, a witness for defendant, was asked by the State, ' if he did not tell Jane Matheny that Campbell was suspected of the murder of Miss Garrett.' Question objected to by defendant, and objection overruled ; defendant excepted. Witness answered, he did not."

The other matters of exception will be readily understood from the opinion and briefs.

A. J. WALKER, for plaintiff in error :

Joseph C. Street should not have been allowed to state his " opinion," either as to the time of day when Campbell left the town of Centre, or as to the period of his absence. Though the court may conclude that a witness may give his judgment from surrounding circumstances, as to the time when an event occurred, or as to length of time, yet, it is evident that, here, the question to the witness and his answer are illegal, because they do not ask or give his judgment founded upon the surrounding circumstances, or upon the impressions on his mind at the particular time. There may, possibly, be a knowledge of time, and of duration of time, derived from surrounding circumstances, which strike every man, and about which there is so much uncertainty that it is difficult to distinguish it from belief. In this instance, the witness was precluded, by the form of the question, from answering from even such knowledge, and was restricted to his " opinion," which may have been derived from rumor, from calculations subsequently made, based upon the representations of others, or from some other illegitimate source. 1 Green. Ev. 488 § 440; 1 Phil. Ev. 226, 227, (top p. 209 ;) Head, use &c. v. Adams, 9 Ala. R. 791, in which case "belief"

is used as synonymous with "best recollection," or "knowledge" about which the witness was not positive; Cameron & Cooper v. The State, 14 Ala. R. 546; Jones v. Hatchett & Bro., *ib.* 744; Hatchett & Bro. v. Gibson, 18 *ib.* 587; Andrews & Bro. v. Jones, 10 *ib.* 470; 4 *ib.* 46; 5 *ib.* 546; Hawthorn v. King, 8 Mass. R. 371.

It is competent for a witness to prove a fact which is the result of a combination of minor facts; and, in this point of view, it might, possibly, have been competent for the witness to state, from the position of the sun with reference to the cardinal points of the compass, or from the length of the shadows cast, or from other circumstances which are recognized criteria in the determination of time, that his best knowledge, (or, possibly, his best judgment,) was, that Campbell left at a given hour, and was absent during a given time. But, in this instance, the witness gives "his opinion" without reference to such facts, or to any facts.—14 Ala. R. 360; *ib.* 154; 10 *ib.* 290; 4 Har. & McH. 63, 64; 6 Conn. 9; 1 Stark. Ev. mar. p. 127.

The "opinion" of the witness as to time and length of time, was, *prima facie*, incompetent. If there was any additional matter that would have made the question legal, it was the duty of the State to have added it. Even though it be allowable to ask a witness his "opinion" of time, as predicated upon facts within his knowledge, the question propounded to Street was inadmissible, because he was not asked for his "opinion" deduced from facts within his own knowledge, but for his opinion generally. Certainly, the opinion of a witness as to time cannot be asked, unless he is referred to facts upon which to base his opinion. It is, however, earnestly insisted, that it is not competent in any case, saving a few exceptions, for a witness to state his judgment even on facts known to himself: it is his duty to state the facts, and leave the jury to draw the conclusion, or form the judgment.—Bullock v. Wilson, 5 Porter 342; Given v. Albert, 5 Watts & Serg. 333; Garrett v. The State, 6 Miss. 1. Distance is susceptible of certain ascertainment.

Asa Allen should not have been permitted to say that the shoes "seemed to fit in every particular." It is not a statement from knowledge, but an inference or conclusion.

Allen's statement, that Campbell "occasionally visited his house, but not so often as others," was totally irrelevant; it

had no bearing on the case in any way, and ought to have been excluded. Even though an inference against the prisoner might possibly be drawn from his unaccustomed presence at Allen's house about the time of the adjournment of the Sunday school, yet there is no predicate for such an inference : it was not shown that the school was in session. His presence, an act harmless in itself, authorized no inference against the prisoner. His presence at any other place in the town of Centre, would have afforded the same evidence, as it might be said that he visited that place " occasionally, though not as often as others." The relevancy of testimony is a question to be determine d by the court at the time the testimony is offered. If it is then *prima facie* irrelevant, the preliminary facts connecting it with the case must be proved, or the counsel must state their intention or expectation of proving them.—Bilberry, adm'r. v. Mobley, 21 Ala. R. 277 ; Abney v. Kingsland, 10 *ib.* 355 ; Scott v. Coxe's Adm'rs, 20 *ib.* 295 ; Lawson & Swinney v. The State, 20 *ib.* 65 ; 9 *ib.* 534 ; 16 *ib.* 316 ; 6 *ib.* 390.

The testimony of Coggins, as to stains on a shirt, was irrelevant. It could have no pertinency to the case, unless it had. been shown, 1. that the stains were from blood ; 2. that the shirt was Campbell's ; and, 3, that he wore the shirt on the day of the murder. None of the preliminary facts necessary to connect this evidence with the case were proved. The testimony conduced to show that the stains were not of blood. The facts that Campbell had been occasionally seen at Mrs. Matheny's house, that no man lived about the house, that Campbell had at one time been seen there, shaving and changing his clothes, that he had also been seen, on the morning preceding the evening when the shirt was seen, coming from towards Mrs. Matheny's, and that the witness knew no person in the neighborhood who wore so fine a shirt, do not collectively prove, to the satisfaction of any mind, that the shirt was Campbell's. There was not. even an attempt made to show that Campbell wore the particular shirt seen by the witness on the day of the murder. The authorities are clear, that the preliminary facts must be proved to the satisfaction of the mind of the court. It is not sufficient that there is a probability of possibility of the existence of those facts ; there ought to be, at least, a preponderance of evidence in favor of the hypothesis that the facts are true. In the case

of Scott v. Coxe's Adm'rs, 20 Ala. R. 296, there was a very high degree of probability of the correctness of the facts showing the legality of the proof, and a total impossibility of obtaining better evidence to establish the claim; yet the court say: "It is not sufficient that there may be some evidence tending to establish the preliminary fact; it must be established to the satisfaction of the court by competent proof."—Hart v. Newland, 3 Hawk's R. 122; 11 Serg. & R. 134; U. S. Bank v. Corcoran, 2 Peters' R. 132; Jackson v. Norris et al., 7 Cowen's R. 717.

If it is contended that the relevancy of this evidence is shown by the testimony of Miss Matheny, and that therefore there is only error without injury, the answer is: I. Miss Matheny was introduced as a witness by the defence, and not by the State. In the case of Lawson & Swinney v. The State, 20 Ala. R. 78, the precise question here presented did not arise, as the connection was made by the testimony of the State. Whenever the court admits illegal evidence, and thereby, in effect, asserts that it ought to influence the minds of the jury, and thus compels the defendant to submit to the injurious consequence of such evidence, or to meet and rebut it by the introduction of counter evidence, injury is sustained. Compelling a party wrongfully to enlarge the area of the examination, and to accumulate evidence upon an irrelevant subject, is error, from which the court must presume that injury resulted. In this instance, if the shirt seen by Coggins did belong to Campbell, it was in the power of the State to prove it by introducing Miss Matheny. But, instead of introducing her, the State procures the admission of irrelevant evidence, and thus compels the defendant to introduce her, to rebut the evidence; and the State is thus enabled to assail her credibility, and obtain the advantage of the legal position that the portion of her evidence in favor of the accused, and in conflict with that of Coggins, must be disbelieved, and that portion which militated against the accused must be credited.— The effect is, to compel the accused to introduce a witness who makes the connection, and then deprive him of the benefit of the testimony when it favors him. If a written instrument, to which there was a subscribing witness, were offered in evidence, and it was admitted by the court without proof of its execution, would this court hold it to be error without injury, if the other party

should introduce the subscribing witness, to prove that the instrument, although actually executed, was procured by fraud or duress? And would the court hold this when an attempt was made to discredit the subscribing witness by the very party who was bound by law to introduce him? II. The testimony of Miss Matheny does not prove that the shirt which Coggins saw was Campbell's: she only proves that Campbell left a shirt with her on Tuesday morning, and that she washed it on that day; but she does not prove that that was the only shirt she washed that day, or that it was the shirt which Coggins saw, or that Coggins ever saw the shirt which she washed. III. It was not only essential for the State to show that the shirt seen by Coggins was Campbell's, but also that Campbell wore it on the day of the murder. It would be inconsistent with the law, which presumes a man innocent until his guilt is shown, to shift the *onus* of proof, by requiring the accused to show that he had not left with Miss Matheny the shirt which he wore on the day of the murder: the *onus* was on the State.—Innerarity v. Byrne, 8 Porter's R. 180. IV. There was no proof that the stains were at all similar to those produced by blood.

If an error is shown to exist, it devolves on the other party clearly to show that such error did not and could not injure the prisoner. If the error could possibly have injured the accused, this court will reverse.—14 Ala. R. 182; 15 *ib.* 623; 21 *ib.* 423; *ib.* 549; 8 Porter 180. The bill of exceptions states enough to show that the court erred in the admission of Coggins' testimony as to the shirt. It cannot be intended by this court, in the absence of a statement to that effect in the bill of exceptions, that there was other evidence which would have made it legal.—Davis v. The State, 17 Ala. R. 415.

The question propounded to Coggins, 'If any person asked him if he knew what would take stains out of shirts,' was clearly illegal, because it asked for the declaration of a third person, and involved an inquiry totally irrelevant to the case; it was well calculated to injure the defendant by making the impression that some person was solicitous on the subject of " stains on shirts." So, also, the reply of Coggins to the question of a third person was, in no point of view, competent evidence.— Winlock v. Hardy, 4 Litt. 272.

A conviction for libel in the courts of a sister State, either renders a witness incompetent to testify, or is admissible evidence

to the jury as affecting his credibility. Upon the question of competency, the following authorities are referred to : The State v. Ridgley, 2 Har. & McH. 120; Clarke's Lessee v. Hall, *ib.* 378 ; Cole's Lessee v. Cole, 1 Har. & John. 572 ; The State v. Candler, 3 Hawks' R. 393 ; 1 Bouv. Law Dic. 396 ; Roscoe's Crim. Ev. 135 ; 1 Phil. Ev. 22, 23 ; Rex v. Ford, 2 Salk. 690; 3 Phil. Ev. (Cowen & Hill's Notes) 1503.

Although the court may conclude that libel is not a species of the *crimen falsi,* according to the common law, which is presumed to prevail in Ohio, yet the conviction for an offence not infamous, committed in a sister State, is competent evidence to affect the credibility of a witness. In cases where the infamy of a conviction is removed by a pardon, the conviction is evidence as to credit. In Massachusetts, where the courts hold that the disqualifications which attach to a conviction of an infamous crime in another State, do not apply to the felon when offered as a witness in that State, the conviction is competent evidence as to credit. The reasons of the rule, that particular acts of immorality cannot be proved on the trial, do not apply to record evidence of a conviction of crime. If the evidence here offered is not admissible to affect the credit of the witness, it would follow that a witness may be convicted, in a sister State, of acts involving moral turpitude, until he would not be credited as to the most trivial concerns of life, and yet may cross the State line and testify in a criminal case as a credible witness, because depositions cannot be taken to establish his bad character in the locality of the convictions.—Commonwealth v. Abner Rogers, 7 Metcalf's R. 501 ; Commonwealth v. Knapp, 9 Pick. 511 ; Commonwealth v. Green, 17 Mass. 502 ; Carpenter v. Nixon, 5 Hill's (N. Y.) R. 260 ; Sorrelle v. Craig, 9 Ala. 528 ; Holman's Heirs v. Bank of Norfolk, 12 Ala. 408 ; United States v. Jones, 2 Wheeler's Criminal Cases 451.

The determination of the question of Stiff's insanity, and consequent incompetency to testify, was for the court.—Livingston v. Kierstead & Hermance, 10 Johns. 261 ; Roscoe's Criminal Evidence 124 ; Harris v. Wilson, 7 Wend. 60 ; Witter v. Latham, 12 Conn. 392 ; Reynolds v. Lounsberry, 6 Hill 534 ; 1 Green. Ev. 472. The evidence adduced to the court to establish Stiff's insanity, is submitted without argument, because the limits of a brief will not permit a full discussion of it. The

court is referred on this subject to Ray's work on Insanity.

The jury were entitled to know the mental *status* of the witness, in order to correctly ascertain the degree of confidence to be placed in his testimony. On that account, the evidence on the subject of insanity should have been allowed to go to them. Facts proving the mental and moral condition of a witness have often been admitted as evidence.—10 Serg. & R. 285; 15 Mass. 184.

The question propounded to Thomas B. Cooper, whether he had furnished a portion of the facts contained in the pamphlet, was illegal and irrelevant.

The question of sanity involved the inquiry as to the condition of the witness' intellect at the time of the trial. L. M. Stiff had seen his father but twice before the trial in three or four months. No previous degree of intimacy would render his opinion on the question of sanity competent at the time of the trial. It is not improbable the excitement of the trial may have elicited a manifestation of insanity, which had not been witnessed for a long time before. The opinion, however, was not asked, as founded upon the facts within his knowledge, but was sought and obtained without reference to those facts.—Norris v. The State, 16 Ala. 776; Baldwin v. The State, 12 Missouri 234.

It was clearly competent for L. M. Stiff to state whether or not there was inconsistency between the professions and acts of the witness whose sanity was controverted. It is unaccountable that he should be competent to give his opinion upon the question of sanity, and yet incompetent to answer the question propounded.—Norris v. The State, *supra*; Baldwin v. The State, *supra*.

The fact of Weir's visiting the jail twice, was totally irrelevant. The simple statement was, that Weir went to the jail twice; but these visits are not shown to have been to Campbell, or to have had any connection with him in any way.

Stiff had deposed to confessions made by the accused. After the rumor had gone forth, that such confessions had been made, an interview took place between him and Campbell on the subject of these confessions. For the purpose of discrediting the witness, the defence asked, 'What did Campbell say on the particular occasion,' with the announced purpose of bringing out the reply of the witness. It is now insisted, that this was com-

petent evidence, because the reply of the witness to the prisoner could not have been understood without a disclosure of the matter to which it was a reply. Admissions may be drawn from the conduct, actions and declarations of a party ; and so, also, of a witness. The question was confined to the subject of the confessions proved by Stiff, and its purpose was simply to discredit him.—1 Green. Ev. 514 § 462.

The permission of the witness to testify as to the secret motive for the conduct which was relied on to discredit him, was objected to. A witness must testify as to facts, and not as to the secret emotions of his mind. Can the impeachment of a witness be avoided by the statement that his intentions are pure ? If not, for what purpose could such evidence be admissible ? No conviction for perjury could ever be had on account of a false statement of the sentiments or feelings of a witness.—P. & M. Bank of Mobile v. Borland, 5 Ala. 546 ; Peake v. Stout, Ingoldsby & Co., 8 ib. 648.

The declarations of the witness Blanton conflicting with his testimony, were incompetent for any other purpose than to impeach him. It is not allowable for the State to impeach its witness, under the guise of refreshing his memory. The place at which the declaration was made, was not stated to the witness.

It was competent to prove that the witness Clayton had been drinking at the time he was testifying, or at the time of the occurrences which he proved; but the general question of "his habits as to drinking," was inadmissible. The same argument that would prove the competency of such evidence, for the purpose of showing the state of his mind, would prove the competency of the evidence of insanity offered to affect the credit of Stiff.

The witness Clayton should have been allowed to state the appearance of Campbell, and his acts, when the intelligence of the murder was communicated to him. The State had been permitted to prove how a horse-shoe "seemed" to fit a track.— This court has decided, it was but to pronounce the judgment of the witness upon a passing event, and "is knowledge, so far as the imperfections of human nature will permit knowledge of such a matter to be acquired." Baldwin v. The State, 12 Miss. 238. The appearance of an accused man is evidence

against him, and certainly ought to be evidence in his favor.—— Johnson v. The State, 17 Ala. 618. The State had been permitted to introduce the same kind of evidence, as to Campbell's looks and appearance, which was proposed for the defence.—— Harris v. Taylor, 13 Ala. 324.

The question propounded to W. B. Watts was, certainly, a proper one, because it is in itself competent evidence, and because it was rebutting to evidence brought out by the State. It would be manifestly unjust, to permit the State to prove that public rumor imputed to the assailed witness certain moral delinquencies, *not involving his veracity*, leaving the impression that public rumor imputed no other immorality, and then debar the defence from eliciting proof of other moral delinquencies, which deprived the witness of all claim to credibility.

The question, 'What does rumor say in regard to those publications,' was legitimate. Certainly it was admissible in response to the cross-examination in reference to those publications. It is submitted to the court, whether the question calling for the witness' "knowledge of the truth of those publications," was not permissible in reply to the cross-examination by the State.

It was legitimate for the defence to extend its inquiry into Stiff's character as far back as possible, and, in doing so, to propound the question, 'What does rumor say of his general character before he came to Cedar Bluff.' The State opened the inquiry as to what rumor said of Stiff's character, and obtained the full benefit of it. Is it not manifestly unjust and unlawful, to permit the State to prosecute the inquiry just so far as suited its interests, and then to stop any extension of the investigation?—Taylor v. Harris, *supra*.

The letter to John K. Hoge was submitted to Stiff, and its authorship proved by him. The letter, then, was clearly competent evidence to contradict him. The entire spirit of it is in conflict with the idea that Campbell had confessed to him the atrocious crime attributed to him.

The evidence as to Campbell's manner when informed by Sampley that suspicion attached (to him) was permissible, to rebut the proof made by the State as to his appearance. His manner and appearance, however, were competent evidence.

The card-playing, and the fact of defendant's winning money

in connection with William H. Stiff, were alike inadmissible, either against the defendant, or against Wm. H. Stiff's credibility.—Johnson v. The State, *supra ;* Nugent v. The State, 18 Ala. 526.

The two questions which were propounded to Mrs. Shackleford, and excepted to, were irrelevant and improper.—11 Wend. 20.

The questions propounded to Miss Anthony, as to the places where she met the defendant, were improper. It could make no difference, so far as this case is concerned, where she met him. So, of all the questions propounded to this witness by the State to which exceptions were saved. The entire examination of this witness seems to have been based upon the idea, that friendly relations with the accused were sufficient grounds for the impeachment of her credit.

It was not competent to ask Jane Matheny whether she had children, she being an unmarried woman. Particular acts of this character cannot be given in evidence to discredit a witness. Even her general character for chastity was not competent.— 18 Ala. 526.

The question, where Jane Matheny's mother was on the day when Coggins said he saw the shirt, was irrelevant. So, of the question asked her, ' What were you doing the day after Campbell left;' for her acts and declarations Campbell was certainly not criminally responsible.

The map ought to have been left with the jury, to be taken out by them on their retirement. It had been admitted in evidence, was commented on, cross-examined on, and the court had charged the jury ; and when the jury were about to retire, the map was taken from them, on the ground that neither the prosecutor nor the State's solicitor was present.—Nolin v. Parmer, 21 Ala. 66 ; Morrison v. Wright, 7 Porter 67 ; Lankford v. Keith & Weir, 21 Ala. 342. The map was put in evidence, and was not withdrawn; nor was it asked to be withdrawn. The question is not as to its competency as evidence, but whether, being evidence, the jury should take it out with them on their retirement.—Clay's Digest 341 § 155.

It was not permissible for the State to prove, by M. Hail, that he did not desire the conviction of an innocent man, for the purpose of counteracting the proof of his hostility to the ac-

cused. The proof admitted and excepted to, in the connection in which it came out, was tantamount to this : ' I think the accused guilty—I do not wish to convict an innocent man—I do not deem the accused innocent, and therefore I desire his conviction.' This testimony is objectionable, also, because the moral sentiments of a man must be inferred from facts, and cannot be proved by a profession of them. How could such testimony be disproved? An impeached witness is safe, if his professions sustain his credibility.

The question asked Gaines, ' What had Stiff done to give him a bad character,' was illegal.

The fact that Cole had made a relation of his evidence to the counsel for the accused, did not tend to impeach him. There was no impropriety in his doing so, and it was, in no point of view, a proveable fact in the case.

The question to Counts was illegal.

P. T. SAYRE, for the Attorney General, with whom was L. E. PARSONS, contra :

Exceptions 1 and 2. There was no error in allowing a witness to state his opinion as to the time of day, or as to the duration of time. There is no other way of proving when an event occurred, or the length of time which transpires between certain events. These are matters of general experience, knowledge of which is gathered by observation, and can only be proved by opinion. Persons who never saw a time-piece, and who are unacquainted with figures, are capable of arriving at very correct conclusions as to time, although they may be unable to explain the particular process by which their conclusions were attained. — Lester v. The Town of Pittsford, 7 Vermont R. 161 ; McKee v. Nelson, 4 Cowen's R. 357 ; 1 Phil. Ev. 291 ; 1 Green. Ev. §§ 7, 11 ; 2 U. S. Digest 259, § 1267.

Ex. 3. It is difficult to see any objection to the form of expression used by the witness, who testified that he saw the horse-shoe applied to the tracks, and that they " seemed to fit :" it was only another way of saying that they did fit.

Ex. 4. The testimony of Asa Allen, that Campbell visited his house " occasionally, but not as often as others," was properly admitted. This proof was material and relevant, when taken in connection with the other proof in the case. It was

shown that a person standing in the door of Allen's house could see when the Sunday school adjourned, and that Campbell was at his house during the morning, and left it about the time when the school usually adjourned.

Ex. 5 and 6. Coggins' testimony was properly admitted. The object was, to connect Campbell with the murder; and every fact and circumstance which could possibly throw any light upon the matter, was admissible. Coggins' testimony, all taken together, conduced to show that Campbell was in the habit of going to Mrs. Matheny's house; that he was there on Monday night after the murder, that he sometimes changed his clothes there, that no man lived about the house, and that the shirt seen by Coggins was unlike those commonly worn in that neighborhood. These facts were persuasive, if not conclusive, to show that the shirt belonged to Campbell. At all events, the testimony was competent to go to the jury. Testimony ought not to be excluded from the jury on account of irrelevancy, unless it is clearly irrelevant.—Shannon v. Kinney, 1 A. K. Marsh. 3; 2 Watts & Serg. 415; Bell v. Rhea & Co., 1 Ala. R. 85; Cuthbert v. Newell, 7 ib. 459; 21 Wend. 548; Cowen & Hill's Notes, Part I, 433. The evidence of Coggins was introduced for three purposes, viz: to establish that the shirt belonged to Campbell; that there were stains upon it; and that it was being washed for the purpose of removing stains. Not only the appearance of the shirt itself, but every thing that was said about it in connection with stains, while it was being washed, was therefore admissible, to show that there were stains upon it, and that the object in washing it was to remove them. The conversation was a part of the *res gestœ*, and served to explain Miss Matheny's possession of the shirt.—19 Ala. R. 727; Enos v. Smith, 3 Conn. 250; Green. Ev. § 108. The proof also shows, that Campbell left his shirt at the house to be washed. This constituted Miss Matheny his agent for that purpose, and rendered her declarations, made while washing the shirt, admissible evidence against him, as part of the *res gestœ*. "An agent is authorized to act; and, therefore, his acts, explained by his declarations during the time of acting, are obligatory on the principal."—4 Serg. & R. 317. It will be presumed that the court below required the proper predicate to be made.— McCrary v. The State, 22 Ala. R. 70.

Ex. 7, 8, 9 and 10. The competency of Edward Stiff as a witness was objected to on two grounds, viz: because he had been convicted of a libel in the State of Ohio, and because he was insane. 1. At common law, conviction of a libel did not render a witness incompetent.—7 Com. Dig. 462; 1 Phil. Ev. 24. Under our statute, a witness is not disqualified for that reason.—Clay's Digest 169 § 2. But if the law was different, a conviction in Ohio would not have that effect in this State.—Commonwealth v. Green, 17 Mass. 541. The question of insanity was properly determined by the court, as the preponderance of proof was certainly in favor of the sanity of the witness at the time of trial.

The record of conviction, and the evidence offered to the court on the subject of insanity, was not admissible evidence to the jury to affect the credibility of Stiff as a witness. In impeaching a witness, his general character only can be put in issue.— Particular acts of moral turpitude cannot be proven.—1 Green. Ev. § 461; 1 Phil. Ev. 291; 4 Wend. 257. Libel is not an infamous crime, and a conviction of it would not tend to affect the credit of a witness any more than the proof of any other falsehood, told by him, which is not of record. At common law, the truth of the libel could not be given in evidence. In inquiring into general character, three questions, it is said, may be asked: 1. What is the general character of the witness for truth when upon oath? 2. What is his general character for truth when not upon oath? 3. What is his general moral character?—Cowen & Hill's Notes, Part I, note 531. Applying these tests to the testimony, it surely does not come within the rule. The record of conviction does not prove that the general character of the witness for truth and veracity, was bad; neither does it establish that his general moral character was bad. If it establishes neither of these points, it was incompetent.

The same reasons obtain in reference to the evidence on the subject of insanity. The law does not recognize any degree of insanity; it does not say that a man is sufficiently sane for one purpose, and insane for another. When insanity is established, it is presumed to be the general condition of the mind. This is a fact, too, upon which the court must decide before the witness is examined; and when it is decided that he is sane, he is a witness, governed by the same rules which apply to all other

witnesses. The mere fact that his sanity has been questioned, does not authorize an attack on his character in a manner different from that prescribed for impeaching other witnesses. The court had decided that Stiff was sane; and the attempt was, to induce the jury to overrule the decision of the court. The issue of insanity *vel non*, had been once determined by the court, and the proposition is then made to try the same issue again before the jury.

Ex. 11. T. B. Cooper was asked, on cross-examination, if he had not furnished Stiff with a portion of the facts contained in the pamphlet. The exception to this testimony was properly overruled. The object was to establish Stiff's insanity, partly by the contents of the pamphlet about which Cooper testified; and if the facts upon which that pamphlet was based, were furnished to him by Cooper, it would certainly tend to relieve the witness, in some degree, from the charge of insanity based upon the pamphlet. Besides, this was a preliminary examination by the court, in which a judge is not governed by the strict rules of evidence.—Hartford v. Palmer, 16 Johns. 144; Givens v. Herndon, 16 Ala. 261.

Ex. 12. L. M. Stiff was properly allowed to state his opinion as to his father's sanity. Edward Stiff returned from Cuba in 1851; his son swore that he had seen him repeatedly since that time, and twice during his confinement at Lebanon. Besides, he was qualified to give an opinion because he was his son.—Norris v. The State, 16 Ala. 776.

Ex. 13. The defendant asked L. M. Stiff whether there was not an inconsistency between the professions and acts of his father. The exception to this question was properly sustained, as the answer to it could only have been the statement of an opinion of the witness. He should have been asked, what were the professions and acts of his father, that the jury might form their own conclusion as to their consistency or inconsistency.— Johnson v. The State, 17 Ala. 623.

Ex. 14. The testimony covered by this exception was properly admitted. A man's flight after an offence is committed, may be proven against him, as a circumstance tending to show guilt; and, upon the same principle, an attempt to escape from custody, or the expression of an intention to escape, is a circumstance which may be proven for the same purpose.—The

People v. Rathbun, 21 Wend. 518; Oliver v. The State, 17 Ala. 587, 595.

Ex. 15. The conversation which occurred in the jail between Stiff and Campbell, and all that Campbell said on that occasion, was properly rejected as evidence. The State had introduced no proof in reference to that interview, and had brought out no part of that conversation : the court, therefore, properly excluded it.—Oliver v. The State, 17 Ala. 595; McLane v. The State, 16 ib. 672; Bradford v. Bush, 10 ib. 389; Tilley v. The State, 3 Iredell 424.

Ex. 16. An attempt was made by the defence to impeach the testimony of Stiff, by showing that he had made contradictory statements; and the court then allowed the State, against Campbell's objection, to prove by the witness his motives in making the statements which were said to be contradictory. There was nothing wrong in this.—1 Phil. Ev. 294 ; 1 Green. Ev. § 467.

Ex. 17. A witness has a right to refresh his memory by looking at a memorandum ; so, if his memory appears at fault, it is not erroneous to refer him to any fact or circumstance by which it may be refreshed. This was all that was done in reference to the witness Blanton. The witness had a right to refresh his recollection by all legal means, and the State had the same right; and this, *after* cross-examination.—1 Green. Ev. §§ 462, 467.

Ex. 18. Clayton, a witness for the defence, was asked by the State as to his habits of drinking, to which the defendant excepted. This was not erroneous. The object was, to ascertain a fact by which to test the capacity of the witness for observing things that transpired around him, and of remembering them afterwards. Any question may be propounded to a witness, which will serve to show that he was or was not in a condition properly to observe or to remember. For instance, if he was examined in reference to a matter requiring keenness of vision, he could be questioned as to the condition of his eyes ; if in reference to a question of science, he could be interrogated as to his proficiency in that science. So in reference to general matters ; it is proper that the condition of the witness in body and mind, at the time when the events occurred about which he testified, should appear before the jury, in order that

7

his testimony may be properly weighed.—11 U. S. Digest 287 § 1912. The party against whom a witness is introduced, has a right to show every thing that may impeach his credit.—13 Serg. & R. 132. To do this, his general character as to drunkenness may be proveen, and it would be for the jury to say whether he was drunk at that particular time.—Tuttle v. Russell, 2 Day's R. 201; Brindle v. McIlvaine, 10 Serg. & R. 285; 1 Green. Ev. § 446.

Ex. 19. There was no error in refusing to allow the question to be put to Clayton, 'whether Campbell did not seem surprised when the report of the murder, &c., was communicated to him.'—Johnson v. The State, 17 Ala. 623.

Ex. 20, 21 and 22. The questions propounded to W. B. Watts by the defence, as to the "other moral delinquencies which public rumor attributed to Stiff," were illegal and irrelevant, and properly excluded by the court.—See authorities cited under exceptions 7, 8, 9, and 10; also, Cowen and Hill's Notes, Part I, 766.

Ex. 23. This exception is to the ruling of the court in excluding proof that there were six indictments for libel pending against Stiff in the Circuit Court of Cherokee. It was not competent to prove the existence of these indictments in that way: the records were the best evidence of that fact.—1 Green. Ev. § 457.

Ex. 24, 25 and 26. The letter written by the witness Stiff to Hoge, was properly excluded, because the proof shows that it was written in Campbell's presence, and by his direction. It contained, therefore, Campbell's own statements and opinions, and not those of Stiff;. and consequently it could not establish that Stiff had made contradictory statements, or expressed different opinions.

Ex. 27. For this point see exception 18.

Ex. 28. The State proved that Wm. H. Stiff and Campbell played at cards with one Vaughan on the evening of the day on which the murder was committed. The witness was also asked, if he and Campbell did not win some money from Vaugham, and answered affirmatively. The question was objected to as irrelevant. Taken by itself, this evidence might be irrelevant; but an effort was made to impeach the testimony of Edward Stiff, who proved certain confessions of Campbell's, and it was

therefore proper to allow proof of every circumstance tending to corroborate his statements : this was the only purpose for which it was offered. Edward Stiff had sworn that Campbell, while making said confessions, used this language : " The world was easily humbugged ; himself and Buck Stiff had won, on the same Sunday the murder took place, Vaughan's horse and money, and made him believe he was his friend all the time." Stiff was in jail at the time the playing took place, and had no opportunity of knowing anything about the matter, except what Campbell told him. Proof that part of what he said was true, is, at best, a corroborating circumstance to which the jury may look.—Cowen & Hill's Notes, Part I, 779.

Ex. 29, 30, and 31, were taken to the testimony of Mrs. Shackleford, during her cross-examination. It was competent to make any inquiry calculated to throw light on the subject, or to show the feelings of the witness towards the prosecution or the prisoner.—Cowen & Hill's Notes, Part I, 773 ; 1 Green. Ev. § 446.

Ex. 32 to 42. The same rule applies to all the exceptions which were taken to the testimony of Miss Anthony.

Ex. 43 to 46, were to the testimony of Miss Matheny. Some degree of intimacy was shown to exist between her and Campbell; her testimony differed from that of Coggin, and it was perfectly proper to apply to her every test known to the law.—1 Cowen & Hill's Notes 729.

Ex. 47. The court properly refused to let the survey go to the jury. It was not an official survey, and possessed none of the dignity of documentary evidence. It was a survey which the law did not require the surveyor to make, and was therefore *ex parte*.—Surget v. Little, 5 S. & Mar. 329. No notice was given to any one representing the State, that such a survey would be made; and the mere fact that it was made by the legally appointed surveyor, lends it no weight or authority, the act not being official. This view is not opposed to the case of Nolin v. Parmer, 21 Ala. 66.

Ex. 50, 51. When witnesses are introduced for the purpose of impeaching character, it is always permissible, on cross-examination, to ascertain the grounds on which they base their opinion.

Several other exceptions were taken to the rulings of the court, but there does not appear anything objectionable in those rulings.

CHILTON, C. J.—The record presents a number of exceptions to the rulings of the presiding judge with respect to the admission of evidence, and as the statute makes it our duty to examine the entire record, and to notice errors, if any have intervened, whether assigned for error or not, it will, perhaps, facilitate our inquiries to take them up in the order in which they are stated in the bill of exceptions, premising, that it would render this opinion too prolix to elaborate the several points which are raised, and that, while we trust we have given to each the consideration which the importance of the case demands, we must be content to state our conclusions, and omit the reasons in many instances upon which they rest.

1. Joseph C. Street was allowed to give " *his opinion*" as to the time of day the prisoner left Centre, the witness stating that he had no time-piece. This evidence was admissible.—Every person of ordinary perception and observation, must be regarded as capable of giving an opinion upon a matter of this nature—a matter upon which every man's knowledge and experience are supposed to qualify him to approximate a correct conclusion. We apprehend no case can be found asserting a different doctrine. Indeed, we know of no case where the point was ever called in question, and yet it is one involved in almost every trial.

2. The same principle covers the objection to the witness' testifying as to the length of time the prisoner was absent from Centre, the witness having seen him when he left and when he returned.

3. The shoes of the horse which the prisoner rode were taken from his fore feet, the horse having no shoes on his hind feet, and were applied to the track leading from Centre to Mrs. Covington's, in the direction of where the body of the deceased was found ; and a witness who saw them thus applied, was allowed to depose that " they seemed to fit in every particular." The prisoner's counsel contends, that, before this could be made legal evidence, it must be shown that the shoes fitted the horse's foot. This was a circumstance, doubtless, about which he might well have cross-examined the witness, to ascertain whether the shoes fitted the indentation made by the horse's hoof, or by the shoes in the earth. In the absence of proof to the contrary, we must presume that, in fitting the shoes to the tracks, they were ap-

plied to the tracks which the shoes made ; and in this view, the proof was not only legal, but constituted a circumstance which might become of importance in pointing out the rider as the guilty agent.

4. Asa Allen, the proprietor of the tavern from which the prisoner started in Centre, was allowed to testify that the prisoner "occasionally visited his house, but not as often as others." This was objected to as irrelevant.

It is certainly the duty of the judge to confine the evidence to the points in issue, that the attention of the jury may not be distracted and led off from them, nor the public time needlessly wasted ; but in cases like the present, depending upon circumstantial evidence, it often becomes a most embarrassing question to determine what circumstance is too remote to admit of any reasonable direction to the jury, in arriving at a conclusion upon the main point of inquiry. It seems to be well settled that, if no presumption to be drawn from the circumstance offered in evidence ought properly to have any weight upon the minds of the jury, the court should exclude it.—1 Phil. Ev. (3 Ed.) 460. Circumstances may be minute, and, considered separately, of very little importance, shedding but a dim ray of light upon the transaction sought to be elucidated ; yet, when grouped together and considered in the aggregate, they may constitute a chain of evidence which draws the mind to a very satisfactory conclusion. An illustration of this is furnished by the case of Mendum v. The Commonwealth, 6 Randolph's Rep. 704. The defendant was indicted for murder, committed by stabbing with a dirk. It appeared that a dirk without a cap had been found secreted near the place of the murder ; and the cap of a dirk, engraved J. H., was handed to a witness, by a negro, a mile and a half from the place, but how the negro came by it no one could tell. The handle was engraved with the letters J. H. ; and it appeared that some 16 or 17 years before, a witness purchased a dirk, with this engraving, for James Hickman, the half brother of the prisoner ; that Hickman had since died, and the prisoner had admitted that a dirk was the only part of Hickman's property he had received. The witness who heard him make this admission saw a dirk in his hands, with J. H. engraved on the handle, but could no farther indentify it with the one now produced. The dirk found secreted

was, from its general appearance, indentified as the one pro-
duced on trial, and the cap produced by the negro apparently
fitted the handle. The prisoner had, before the murder, lent a
dirk, not indentified on the trial, which was returned to him be-
fore the murder was committed. There was no proof that the
prisoner had ever been at or near the place of the murder.—
These circumstances were allowed to go to the jury, as evidence
that the dirk found belonged to the prisoner, and they were told
that, if they had no doubt of its being his 'property, then the
prisoner's dirk so found made one circumstance to be weighed
with others. The annotators upon Philips, (Cowen & Hill, 3
Ed., vol. 4, p. 598, n. 307,) in commenting upon this case, say:
"Now it is obvious how perfectly slight, and utterly inconclusive,
any one, or any two or three, of these circumstances must have
been ; yet all being combined, the result of the trial (a verdict
of guilty) shows that the jury felt safe in acting upon them, as
leaving no doubt."

So, also, the conduct of the prisoner, his situation and locality,
the opportunities he had of knowing when the deceased left the
school, and whether his being found in that position at that
particular time was or not an unusual occurrence with him, are
all circumstances very weak in themselves, yet not so wholly
foreign from the main inquiry as to justify their rejection.—
" Every thing calculated to elucidate the transactions is admis-
sible, since the conclusion depends upon a number of links, which
alone are weak, but, taken together, are strong and able to
conclude."—McCann v. The State, 13 Smedes & Marshall
471.

" Presumptions from a·man's conduct," says Mr. Russell,
(7 Amer. Ed., vol. 2, p. 72,) " operate in the nature of admis-
sions ; for, as against himself, it is to be presumed that a man's
actions and representations correspond with the truth."—See
also 3 Stark. Ev. 26.

Tested by these rules, it is clear the proof made by Asa Allen
was proper, as it tended to show whether the defendant, in being
at his tavern near the court-house, on the Sunday morning of
the murder, was in an unusual place. That it may have been
exceedingly weak, matters not. It was not wholly foreign from
the case, but tends, though remotely, to elucidate it.

5. The prisoner was seen on Tuesday morning after the mur-

der, by a witness named Coggins, coming from the direction of the residence of a Mrs. Matheny, where the witness had frequently seen him on previous occasions. Mrs. Matheny, it appears, did not reside in the neighborhood of the prisoner. She lived with her daughter Jane, an unmarried woman who had two children, without any other person in the family. Coggins testified that he had seen the prisoner there one morning before the Tuesday spoken of, shaving and putting on clean clothes; that on the Tuesday evening after the murder, while the elder Mrs. Matheny was at his house weaving, he called at her house to get a drink of water; found no one there but Jane; she showed him a man's shirt having a neat linen bosom; that there were splotches on the bosom, three or four small stains about the size of a grain of corn, which looked more like the stains from chesnut timber than anything else the witness could compare it to; that there was also a splotch on the cuff of the right sleeve about the size of a half dollar. It was the only garment being washed which he saw; that Jane put some soap on it, and hung it on a chair; that no man lived about the house, and witness knew of no man in that neighborhood who wore so fine a shirt. The witness was asked, if any person inquired of him if he knew what would take stains out of shirts? to which question the prisoner objected, but the court permitted the witness to answer, that the question was asked him, and to give his reply as to what would do it, and the defendant excepted. He also moved to exclude from the jury all the witness had said with reference to the shirt and the stains upon it, but the court refused to do so. The prisoner's counsel insists that this proof was irrelevant. It appears that, after this proof was allowed, Jane Matheny was introduced by the prisoner, and her testimony conduced to show that the shirt spoken of by the witness Coggins, belonged to the prisoner, which proof was elicited upon cross-examination on the part of the State.

It is frequently difficult to ascertain, *a priori*, whether proof of a particular fact will or will not become material; and it is usual in such cases for the court to allow the proof, upon the assertion of counsel that the fact offered to be proved will turn out to be material.—4 Phil. Ev., C. & H., n. 307, p. 598, 3 Ed.; or that some other fact, upon which its relevancy may depend, will, in due time, be proved. In such case, if the subsequent

proof is not made, the court will exclude that dependent on it from the jury. "But it is different, however," say the annotators above referred to, "where the proof tends apparently, in its own nature, to make out the case, though the residue be not offered."

We should be strongly inclined to hold that, aside from the evidence subsequently made by Miss Matheny, tending to connect the prisoner with the shirt, the proof was properly received. He was frequently seen at this house—was seen that morning going from the direction of it; no male person resided there; and he had been seen to change his clothes there on a former occasion;—the shirt was being washed, and the inquiry as to what would take out the stains, but seemed to call the witness' attention more particularly to them; and being connected with the possession and washing by Jane, formed part of the *res gestæ*. We, as we have intimated, think it may well be questioned whether this proof was not proper for the jury, had no other evidence of the ownership of the garment been introduced; but we do not entertain a doubt of its being rendered entirely competent by the evidence made by Miss Matheny, who proved that it belonged to the prisoner. That the ruling of the court in its admission may have induced the prisoner to introduce the witness Jane, thereby making her his witness, may be true; but we do not perceive how this can affect the legality of the proof previously offered, and which it connects; nor does the record show that the prisoner was under the necessity of introducing her, by the ruling of the court.

That it was competent to prove that stains were found upon the shirt, we think, is shown in the previous portion of this opinion. It was for the jury to determine the weight to which such circumstance was entitled, and whether said stains were caused by chesnut timber, or by blood.

6. Upon the trial of the cause, one Edward Stiff was allowed to testify to certain confessions made by the prisoner to him.— The prisoner insisted that he was an incompetent witness, because he had been convicted of publishing a libel in the Court of Common Pleas, of Hamilton County, in the State of Ohio, the record of which conviction was read to the court.

Waiving the consideration of the question, whether a conviction of an infamous offence in another State would render the

convict incompetent to testify in this, it is sufficient to state, in response to this objection, that a conviction for libel does not disqualify the witness. In England, where, for a libel against the government, a party was condemned to stand in the pillory, thus superadding ignominious punishment, it was held not to render him incompetent to testify as a witness.—Gilb. 127 ; 2 Russ. on Cr. (7 Amer. Ed.) 974. Our statutes have not changed the common law in this respect.

7. The prisoner, after the court ruled that the witness was competent notwithstanding the conviction of libel, offered the exemplification of the record of said conviction in evidence as tending to discredit the witness, but the court rejected it.

We do not see upon what principle the evidence offered could be allowed. It did not tend, even in respect to the subject matter of the libel, to prove that the party had perverted the truth ; for, by the common law, which we must presume, in the absence of proof to the contrary, obtained in Ohio, the truth of the matter averred as libellous could not upon a criminal prosecution be given in evidence.—1 Russ. on Cr. 222. The most, therefore, the record would prove is, that the witness wantonly or maliciously published a piece in the newspaper, which, although it may have been true, was calculated to irritate and incite to a breach of the peace. In Utley v. Merrick, 10 Met. Rep. 302, it was held, that a conviction of the offence of obtaining goods on false pretences, did not render the party an incompetent witness, and that the record of such conviction could not be given in evidence for the purpose of affecting the witness' credibility.

There would certainly have been more propriety in receiving the evidence in the case just cited than in this, for that was a matter which affected the defendant's veracity; this does not.

8. The prisoner offered another objection to the competency of Stiff as a witness, namely, that at the time he was called to testify, and for some time previous thereto, he was and had been insane.

To this point there was a great mass of testimony offered to the court, consisting of extracts from a newspaper which was shown to have been edited by the witness and his son, but the articles from which the extracts were taken were shown to have been prepared by the witness. Some of these related to the

7*

great advantages that would accrue to the country, and especial-
ly to Cedar Bluff, the village where the paper was published,
from the construction of a rail road from that point to Gunter's
Landing, as "the most feasible and important link in the grand
chain of communication between the Atlantic sea-board and the
mighty valley of the Mississippi." In speaking of the consum-
mation of such an enterprise, he says, " Our own beautiful
plain is destined for the locality of perhaps the first city in the
State of Alabama :—Who doubts it ?"

The record abounds with extracts, some of which are of a
personal character, reflecting upon individuals whom he names,
and who, he supposes, have conspired to injure him in various
ways. It also contains several pamphlets, shown to have been
written by him, and which indicate a love of the marvelous, and
that the mind of the author is wont to feed upon the stimulus
of exciting subjects even at the hazard of involving his person-
al safety, a consequence upon which, at the same time, his wri-
tings indicate perhaps a morbid sensibility. It would, however,
render this opinion too prolix to attempt to set out this proof,
much less to comment upon it in detail. The question was,
whether the witness, conceding him to have labored under men-
tal delusion at a previous period, was at the time of the trial of
sound mind ; and upon this point we have the concurrent testi-
mony of his son, L. M. Stiff, and of three physicians, namely :
Doctors Rawls, Lawrence and Sparks.

Doctor George was of opinion that the witness had naturally
an excessive development of the imagination, and he in-
clined to the opinion, which he had formed from his writings
and vague conversation, and from a letter received from him,
that the witness was affected with monomania.

9. Neither do we think the judge erred in excluding from
the jury the evidence offered to prove the witness insane, as
affecting his credit.

It is no objection either to the competency or credibility of a
witness, that he may be subject to fits of derangement, if at the
time he is offered it appears that he is sane.—3 Phil. Ev. p. 6,
note 6, and cases cited; Evans v. Hettick, 7 Wheat. 453 ; James
v. Stonebanks, Coxe's Rep. 227 ; 10 Ser. & R. 282 ; 4 Phil.
Ev. C. & H. Notes, p. 753 n. 387.

10. The questions attempted to be raised upon the objections

to testimony offered *to the court* upon the preliminary inquiry as to Stiff's sanity, we need not review; for the proof being for the consideration of the judge alone, we would not intend he was influenced by any evidence which was not proper to be considered by him, and for the more satisfactory reason, that, excluding all the evidence objected to, enough remains to exclude any reasonable doubt as to the witness' competency.

11. The witness Stiff, having been admitted to testify, was allowed to prove, against the prisoner's objection, that the prisoner told him that he (the prisoner) had assisted by means of a false key to get old man Weir's son out of jail, who was in prison upon a charge of horse-stealing, and that Weir would assist the prisoner in escaping. He also testified that Weir had come to the jail twice, which was likewise objected to by prisoner's counsel.

In Dean v. The Commonwealth, 4 Grattan 541, the offer of a prisoner to bribe the person who had him in custody, to permit him to escape, was held properly receivable in evidence against him, although the offer and the attempt was made when the prisoner had been committed on a charge of a different offence from that for which he was tried, the charges for both offences being founded on the same fact. It is a portion of the prisoner's conduct, or rather of his declarations indicating a line of conduct, operating in the nature of admissions.—2 Russell on Cr. 729. And the fact that Weir came to the jail, only serves to show that the prisoner had the opportunity afforded him of having entered into the arrangement with him.

12. The prisoner, having proven by Stiff that a conversation was had between him and Stiff, in the presence of several persons, relative to an expected difficulty between the witness and prisoner, growing out of the report that the defendant had made confessions of guilt, asked the witness, with a view of bringing out the witness' reply, to state all that the defendant, Campbell, had said to him in that conversation. The counsel for the State objected to this evidence, and the court refused to allow the question to be answered. We are unable to perceive any error in this. The defendant could not give his own declarations in evidence, unless they constituted a part of the conversation which had been drawn out at the instance of the State, which was not the case here.

If the object was to impeach Stiff, he should have asked whether he had not made certain statements at this time and place. In this way his reply would have gone before the jury, or, if he denied making the statements, he would be subject to be discredited by proof that they were made.

There is certainly no rule of law which would justify the prisoner's making evidence for himself, by proof of his own declarations, as a means of getting at the reply of the witness who is introduced against him.

13. It appears, however, that after the court rejected the prisoner's declarations, the question was asked the witness Stiff, whether he had not made certain statements in the jail, in the presence of certain persons, laying the predicate for impeaching said witness. Stiff replied, that he had made statements, but they were different from those propounded to him, and that he had evaded answering the questions in the presence of the jailer and others. The State, to rebut any presumption which might be drawn unfavorable to the witness from such evasion, inquired for the motive which induced his conduct on the occasion referred to, in not communicating freely on the subject of confessions. This was objected to, but allowed.

It is a well established rule of law, that where a witness has been cross-examined respecting his former statements with a view of impairing his credit, the counsel who called him has the right to re-examine him, so as to afford him an opportunity of explaining such statements, (2 Russell on Cr. 937 ;) and it is also said by the same authority, that he may be asked what induced him to give to the person or persons to whom he made the communication the account which he has stated in the cross-examination.—*ib.* 937 ; 2 Brod. & Bing. 297. These authorities show that there was no error in admitting the witness Stiff to make the explanation, as to the motive which influenced him in saying no more than he did about Campbell's confessions on the occasion inquired of in the cross-examination.

14. The State's attorney was allowed, against the defendant's objection, to ask a witness on the part of the prosecution, (Blanton,) whether he had not on the day preceding made statements conflicting with those he now made on the trial ; the avowed object of the examination being to refresh the witness' memory.

Whether it is permissible for a party to propound such question to a witness whom he has called, is a question upon which there exists some diversity of opinion. Professor Greenleaf, (vol. 1, § 444,) in his work on Evidence, collects the authorities in a note, and says in the text that the weight of authority is in favor of admitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial; or that the witness has recently been brought under the influence of the other party, and has deceived the party calling him. " For, it is said, this course is necessary for his protection against the contrivance of an artful witness, and that the danger of his previous declarations being regarded as substantive evidence, is no greater than it is where the contradictory declarations are proved by the adverse party."—See the cases cited, Note 1 to vol. 1, Greenl. Ev. p. 601, 3d ed. The same doctrine seems to be sanctioned by the annotators on Phillips, (Cowan, Hill & Van Cott,) vol. 4, pp. 769–70, Note 395.

The point underwent a thorough discussion in Wright v. Beckett, 1 M. & R. 414. In that case, the witness for the plaintiff testified directly against him, and the plaintiff's counsel asked him (as was asked in the case before us) whether he had not given a different account of the facts to the plaintiff's attorney two days before. This question was objected to, on the ground of its obvious tendency to discredit the witness; but the objection was overruled, and the question was allowed to be put. The cases are ably reviewed by Lord C. J. Denman, who arrives at the conclusion that there is no direct authority compelling the exclusion of such evidence, but some of the cases appeared on principle to prove it admissible, and as truth and justice might materially be affected by its exclusion, he held it proper.

Mr. Baron Bolland dissented, and also delivered an opinion embracing his views.

Mr. Phillips, in his work on Evidence, (vol. 2, p. 560) after stating the arguments *pro* and *con.*, concludes, that upon a review of the arguments, the superior force of reasoning is decidedly with Lord Denman. The rule has been since generally acted on, in accordance with his view, by the English courts.—See Dun v. Arlett, 2 Moody & Rob. 122; *ib.* 153; Phil. & Am. on Ev.

904; Rex v. Oldroyd, Rus. & Ry. 88; Rice v. New Eng. Marine Ins. Co., 4 Pick. Rep. 439; Brown v. Bellows, *ib.* 179; 1 Haw. 437; 6 Watts & Serg. 285.

We are disposed to regard the doctrine as maintained by Lord C. J. Denman, and sanctioned by Professor Greenleaf and Mr. Phillips, as correct, at least to the extent of allowing the inquiry to be put to the witness. Whether we would go farther and hold that another witness might be called to prove his conflicting statement, is not a question now before us, and one which we do not decide.

Although we cannot well see how the inquiry could refresh the witness' memory, yet as the question was proper in another aspect, and no injury was illegally done the prisoner, there was no error in admitting it.

15. The defendant introduced one Sampson Clayton as a witness, and on cross-examination he was asked by the counsel for the State as to his habits of drinking.

In order to ascertain the credit due to the testimony of a witness, the jury should be informed of his opportunity for observation, the accuracy with which that observation has been conducted, the fidelity of memory with which it is related, the witness' habits, pursuits, his conduct, disposition, situation in life, his relation to the parties, &c. Indeed, it would be impossible to define the exact limits to which a cross-examination may extend, and beyond which it may not go; for much must be left to the sound discretion of the court, regulated by the general rules of evidence, as applied to the varying circumstances of each case.—3 Phil. Ev. 588. The great object is, to elicit the truth from the witness; and a searching cross-examination is often a most efficacious test for its discovery. "By means of it," says Professor Greenleaf, "the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory and description, are all fully investigated and ascertained," &c.—1 Greenl. Ev. § 446. Tested by the rules governing cross-examinations, it is very clear that the question propounded to this witness might not only have been entirely proper, but indispensable in arriving at his inca-

pacity to have observed with accuracy the facts and circumstances about which he was called to testify.

16. The State having proved the appearance of the prisoner the evening of the day of the murder, and on the following day, the prisoner offered to prove that on the third day thereafter, while at Lebanon, on being informed of the murder of Miss Garrett, he appeared surprised; but the court, on the objection of the counsel for the prosecution, rejected the proof. In this we think the court committed no error.

We have seen that the conduct of the prisoner may be given in evidence against him, on the ground that, as against himself, a man's conduct and representations are presumed to correspond with the truth, (2 Russ. on Cr. 739); but, as presumptions from conduct operate in the nature of admissions, the prisoner could no more make his appearance or conduct evidence, than he could his declarations or admissions.

The mind and conscience may be so overpowered by a sense of guilt, and of the awful retribution which attends it, as involuntarily to compel the person thus affected to furnish external manifestations of its existence, and such indications are properly enough received against him. Whereas, on the other hand, a person never so guilty may, at times, so far succeed in stifling his conscience, and suppressing his real emotions, as to subject his conduct as well as his appearance, in a great measure, to his volition, and thus simulate a demeanor apparently inconsistent with guilt; and to allow such demeanor to go in evidence, at his instance, would be to permit him to manufacture evidence for himself. This also disposes of the exception to the exclusion of Sampley's proof, that when the prisoner was informed by him that he was suspected of the murder, he seemed astonished.

17. The defence proved by William B. Watts, that he was acquainted with the general character of Edward Stiff, who had been examined by the State, and that he would not believe him on oath in a court of justice. It appears that the State, on cross-examination of this witness, "proved that public rumor imputed to said Stiff a bad moral character as to drinking, fighting, shooting at men, the murder of a man by the name of Gilbert, and certain publications, which were reputed false, in his newspaper."

The prisoner then asked the witness, upon a re-examination,

the following questions:—1st. What other moral delinquencies public rumor attributed to said Stiff? 2d. What does rumor say in regard to these publications? 3d. Whether the witness did not know of his own knowledge that they were false?

These questions, upon the objection of the State, were all excluded by the court.

A witness may be impeached by cross-examination, or by proof of general character by other witnesses. If the latter mode is resorted to, the witnesses cannot be inquired of as to particular facts, for no man can be supposed to come prepared to defend against such proof, and to elucidate and explain every transaction of his life which might be arrayed before the jury, and which, unexplained, might cast a stain or unfavorable imputation upon his character.

In the present case, however, the State brought out, upon cross-examination of the impeaching witness, the evidence of particular acts tending to impeach the character of Stiff. Why this was done, the bill of exceptions does not inform us. It may be, that they constituted the grounds of the impeaching witness' opinion that Stiff was not entitled to credit on his oath; but this does not appear, and the rule is, to construe the bill of exceptions most strongly against the party excepting. As the evidence is here recorded, it would seem that, after the witness Watt had been examined by the defendant touching Stiff's *general* character, the State, upon cross-examination, superadded proof that public rumor gave him a bad character as to several particulars, namely, as to his drinking, fighting, shooting at men, the murder of a man by the name of Gilbert, and certain publications, which were reputed false, as published in his newspaper. As to all these particulars, being new matter brought out upon the cross-examination of the State, it may be conceded the prisoner had the right to re-examine the witness. But it is very clear that the court had the right to confine the re-examination to matter strictly rebutting. He has no right to go farther, and to introduce matter new in itself, and not explanatory of that proven by his adversary's examination. Such was the opinion of seven out of the eight judges taken in the House of Lords in the Queen's case, as delivered by Lord Tenterden.— 2 Brod. & Bing. 297; see 1 Green. Ev. § 468, § 469.

It is hardly necessary to say that the questions here excluded

called for new matter, opening up an investigation which might have consumed days on collateral matters, which, to say the least of them, had but a remote bearing upon the cause. If the court had no power or discretion to terminate such inquiries, they might become almost interminable; for, if on the re-examination new matter is elicited, the other side may with equal propriety insist upon re-examining as to that, and to bring out new matter in turn, and so on, *ad infinitum*.

We therefore think the court very properly rejected the questions, and terminated the examination where it did.

18. The same witness was asked by the counsel for the prisoner this question, "What did rumor say as to Stiff's general character before he came to Cedar Bluff?"

If we concede, what appears to be much controverted by the authorities, that the impeaching witnesses are not confined to proof of general character for *truth and veracity*, but to general character merely, still it is clear that this question was improper. It is an attempt to prove a man's general character at one place by what rumor said of it at a different place and time.— We know of no precedent which authorizes such proof, and it is certainly opposed to principle and legal analogies.

19. The proof offered to be made by Chisholm, that there were in the Circuit Court of Cherokee six indictments for libel against the witness Stiff, with a view of impeaching the latter, was properly excluded. We have seen that you may impeach a witness by general evidence only, and not by proof of particular facts; for, as to these, it is not presumed the party can come prepared to defend.—2 Russ. 7 Ed., p. 939 and note z.

20. We are wholly unable to perceive how the letter written for the prisoner by the witness Stiff to Mr. Hoge, or any part of it, can be allowed as evidence for the prisoner. If offered to impeach Stiff, it was improper under the principle last above asserted; and if offered as original testimony of the contents, it was clearly improper as being the declarations of the prisoner, or rather of Stiff made at his request, while they were in the jail together.

21. The proof offered to be made by the State that the prisoner, on the Sunday of the murder, in connection with Wm. H. Stiff, won money in playing at cards of one Vaughan, was proper. It was giving a history of the prisoner's acts during that

8

day, a matter which might throw light upon the transaction.—
At all events, we cannot undertake to say, that it was so whol-
ly foreign from the case as to be irrelevant. What we have
said in the fourth paragraph of this opinion, in respect to Asa
Allen's testimony, is equally applicable to this.

22. The interrogatories propounded upon cross-examination
by the State, to Mrs. Shackleford and Miss Anthony, who were
examined in chief on the part of the prisoner, clearly fall within
the principles of law which we have asserted in the fifteenth
paragraph of this opinion.

They sought to inform the jury as to the relation which exist-
ed between these witnesses and the prisoner, whether they were
on terms of friendly intimacy—their means of knowing the
facts to which they testified, and as to any bias or prejudice
which might influence them. The same may be said of the
cross-interrogatories to the witnesses Gaines, Cole and Counts;
they do not exceed the bounds properly assigned to a cross-
examination.

23. The interrogatory propounded by the counsel for the
State on the cross-examination of Jane Matheny, a witness ex-
amined by the prisoner, and who stated that she had never been
married, namely : " Have you any children?" was entirely
competent, as tending to establish the fact of her being a prosti-
tute. It is unnecessary for us to decide whether she was bound
to answer the question, on the ground that it might tend to
criminate her. This question is not before us. The question
might properly be asked, although the witness might have claim-
ed her privilege, and have been justified in refusing to answer
it.—2 Russ. on Cr. (7 Ed.) 926-7, and notes.

The questions propounded to this witness, as to where her
mother was the day Coggins swore she had shown him a shirt,
and as to what she was doing the next day thereafter, and as
to her declarations tending to show her intimacy with the priso-
ner, were proper, under the rules above laid down. The courts
very properly allow much latitude in such cases, as it is not un-
frequently the only means of exposing an unworthy witness.

24. The prisoner offered Edmund Bell, the county surveyor,
as a witness, who proved that he had surveyed the grounds
and distances about Centre, and the routes supposed to be con-
nected with the prisoner's guilt, and exhibited a map of such

survey, showing the different routes and localities mentioned in the testimony. This diagram was proved to be correct in every particular, and was introduced on the part of the prisoner, at first, without objection from the State's counsel, who cross-examined the surveyor concerning it. The prisoner's counsel insisted that the jury should take it with them in their retirement to consider of their verdict; but, on objection by the State, the court refused to let the jury take it, upon the ground, as stated in the bill of exceptions, that there was no evidence that the prosecutor or any one representing the State was present when the said survey was made.

The rule is, that "a witness may use a plat, diagram or map, made in any way, to explain or make himself intelligible to a jury, though it cannot go to them as evidence."—4 Phil. Ev. (3 Ed.) 726, n. 376. It amounted to no more than if the witness had written down his testimony to aid his memory on the examination, and no one would contend that such memorandum, as a matter of right, could be taken by the jury. We will not say that the judge might not, in the exercise of his discretion, have permitted the jury to take it in their retirement, but he was not bound to do so; and although he may have predicated his refusal upon a wrong ground, we cannot say that he has exercised his discretion improperly. In other words, having a discretion, his act is not revisable on error.

25. The State offered Martin Hale to sustain the credit of Ed. Stiff. The prisoner, on cross-examination, proved by the witness that he had taken an active part in this prosecution, and that he cherished unfriendly feelings towards the prisoner. The State, upon re-examination of the witness as to the extent of his feelings of hostility to the prisoner, asked him "if his feelings towards Campbell were such as to desire to see an innocent man convicted?" To this question the prisoner objected, but the objection being overruled, the witness answered that he had no such desire.

We are unable to perceive any error in this. It was explanatory of the witness' state of feeling, which the cross-examination had brought out, and tended to show that, notwithstanding he was unfriendly to the prisoner, he did not desire to do him injustice by producing a conviction against the evidence.

26. The question propounded to Mr. Brindlee, on cross-

examination by the prisoner, "whether from general rumor it was not his opinion that Stiff was a cold-blooded murderer," and which the court rejected, requires no other response than that it called for the individual *opinion* of the witness, founded on rumor, respecting the guilt of Stiff as to the crime of murder. The bare statement of the proposition is sufficient to stamp the inquiry as wholly improper.

We have thus given to the numerous exceptions, taken upon the trial in the court below, a patient investigation. Many of them seem to call in question what we regard very simple propositions of law; but the importance of the case to the prisoner, and an earnest desire on the part of the court to see that no principle of law should be violated in his conviction, have induced us to consider every point which the record presents.

After the fullest consideration which it was possible for us to give the case, the court is unanimous in the opinion that there is no error in the record, and the sentence of conviction is consequently affirmed.