The Commissioner.
The case presented for adjudication, upon the facts now in evidence, is one primarily of tort arising from the negligence of a servant in the employ of the respondents. It rests, therefore, upon that well established principle in the law of agency, which makes the act of the servant the act of the master whenever performed in the line of his duty, and fixes the responsibility for the consequences of such discharge of duty upon the master, in obedience to the *238 maxim of respondeat superior. But apart from the legal aspects of the case in their relation to any just cause of action arising therein, several novel points in the law of evidence have arisen from the hearing, for which there are no precedents in the books. Their discussion consequently opens a new field for judicial inquiry, in relation to the value of the testimonial evidence of insane persons, or of those who, having been insane, are restored once more to their civil rights. The opportunities for such testimony are multiplying daily, and the responsibility, both legal as well as moral, which it may tend to fix upon the managers and super: intendents of our lunatic asylums, are so grave that I feel myself justified in the discharge of the new and judicial duties imposed upon me by statute, in making a precedent of this case, and in announcing, at the outset, the conclusions of law, by which I shall hereafter be guided in disposing of similar issues.
The following are these conclusions, viz:
First.—That in an action against the custodians of a lunatic for tort to his person, he is a competent witness, but the defendants may show acts, on his part, of a contributory character tending to set in motion the causes of the injuries complained of, although intention cannot be imputed to him.
Second.—An insane person may be competent to testify to facts not relating to himself according as the court is satisfied with the degree of his understanding; and a person who has been insane, and is apparently recovered may testify to facts occurring during the period of this insanity, provided, that in both mentioned cases the facts testified to are objectively demonstrable, and' constitute a basis from which to begin such testimony.
Third.—A personal and self regarding incident occurring during a period of insanity, and testified to by its subject either while still insane or when recovered *239 from that state, is not per se an evidential fact, and its probative force rests wholly upon corroborating circumstances.
I need hardly say that these conclusions are derived from principles in the law of evidence, which have become fixed by time and experience. They are the metewands of the law in respect to all testimony, for however sincerely and veraciously given that testimony may be, the constitution of the human mind is such that since even in health it is amenable to error, it must follow that in disease error is the tendency against which it can least protect itself.
The facts wearing the semblance of mal-administration which the relator prays may be inquired into are embraced in the following inquiries :
First.—Whether the governors of the New York hospital now have in their employ, at the Bloomingdale asylum, an attendant named Jane Eaton, whom he avers that he has reason to believe is negligent, incompetent and cruel in her treatment of the insane.
Second.—Whether certain injuries alleged by him to have been inflicted upon his wife while a patient at that asylum, and under the immediate care of the said Jane Eaton, were, as matters within the purview of the proper medical supervision of his wife, known to the physicians in charge of her, or to the governors of that institution.
Third.—Whether, if such alleged injuries escaped the observation, and were never brought to the knowledge of either the physicians or governors aforesaid, while his said wife remained committed as an insane person to their custody and medical supervision, then, whether any system of concealment is habitually practiced by attendants in the Bloomingdale asylum, whereby the physicians thereof are not kept duly informed of the physical and mental state of their insane *240 patients, and cannot, in consequence, maintain such a record of their cases as is required by law.
Fourth.—Whether, if such facts so alleged by him be substantiated, the system permitting their existence is not one dangerous to the well-being of the insane, and calculated to destroy public confidence in the administration presiding over an institution devoted to their care.
Before proceeding to the consideration of these charges, as seen in the light of much conflicting testimony, it may be well to review the position, which under our lunacy statutes, as recently codified, the parties before me occupy towards each other. For although these statutes do not alter the common law relations of the relator to the respondents, they have newly declared the powers of the State as the custodian of its insane citizens, by instituting methods of supervision, visitation and judicial inquiry into their condition, not heretofore promulgated in the form of legislative enactments. A few sentences will suffice toesplain the spirit and scope of these statutes.
The statute creating the office of State commissioner in lunacy, was designed to provide immediate remedies solely for persons in the actual custody of asylums ( Vide chap. 446 of 1874, tit. 10, § 4, and amendments, thereto in chap. 574 of 1875, and chap. 367 of 1876). The reason is obvious. For those who may have been patients in them, and are no longer so, the courts are-open for any redress to which they may feel themselves entitled. If they have been wronged, they have their remedy at law, but that remedy cannot be obtained from the commissioner, for they are no longer within his jurisdiction. It was to protect those who cannot protect themselves by appealing to courts that the statute was passed, and even the remedies which the commissioner can supply, are in their nature only provisional, and in no wise modify the original jurisdiction *241 of courts in similar cases. It is only, therefore, under the second clause of the forms of possible and prospective wrong to lunatics, recited in the statute as a foundation authorizing the intervention of the commissioner, viz., “whenever there is inadequate provision made for their skillful medical care, proper supervision, and safe keeping,” that I find myself authorized to act in the present case. ■
Giving the most liberal construction to the powers granted me by statute, the wrong to be remedied must be either actually happening to a patient now in an asylum, or so generally impending as to constitute a constant menace to his health or security, and thus to form part of a system of habitual misgovernment of the institution. I cannot, therefore, act upon a mere presumption of wrong, but must be justified by such evidence as would amount to a strong probability, derived from a course of events moving generally in one direction.
Now, there is no allegation before me that any patient is to-day, or has been at any time before or at any time since Mrs. Norton’s detention in the Bloomingdale asylum, habitually maltreated or neglected, or in anyway inadequately provided with “skillful medical care, proper supervision and safe keeping.” All presumptions derived from time, and the history of that institution are to the contrary.
The relator, in his affidavit, confines himself exclusively to charging acts of cruelty or harshness as having been inflicted upon his wife by an attendant in the asylum. But he does not state that he believes such acts were done either with the knowledge, assent, or by the command of the medical officers of the institution or its managing board, the governors of the New York Hospital. Nor does he state that he believes such acts either are or have been of common occurrence there, or that they have ever been repeated.
*242 If the acts of wrong, charged by him against the attendant, Jane Eaton, are merely personal acts limited to his wife alone, and not acts of agency done in the line of her appointed duty, then, whatever their nature or consequence, 1 can administer no relief to the relator, since his wife is not a patient in the asylum, and is not within my proper legal jurisdiction. But, if I rightly understand Mr. Horton, the motive which has inspired him to demand this investigation is not one of obtaining personal redress against either Jane Eaton or the governors of the Hew York Hospital. He brings his complaint before me, asking to have it inquired into, whether the wrongs alleged to have been committed upon his wife are part of a system of erroneous supervision now in force at the Bloomingdale Asylum. This is the crucial and only point, in fact, upon which I am authorized to adjudicate. If he has established that fact, he has substantially established his whole case—if he has failed to do so under the rules governing the construction of legal evidence, then there is properly no case upon which I can pass.
The testimony of the relator shows that his wife, being insane, and adjudged a fit subject for treatment in an asylum, was admitted to Bloomingdale on January 22, 1874, where she remained until December 24, in the same year. That some few months after her commitment there, she grew worse, and had to be removed to a different ward from that in which she was first placed, when she came undei\ the charge of two attendants, severally named Jane Eaton and Jane Gordon. That during her stay in this ward, she was very weak, and labored under certain hallucinations, all of which led her to refuse taking food. That, in consequence of this, and in order to save her life, it became necessary to feed her by force, as is usual in similar cases. That this feeding was done by Jane Eaton in the presence and by the assistance of Jane Gordon*
*243 The relator further testifies that on several occasions, while visiting his wife, he saw bruises upon her face and neck, which he believes were inflicted by Jane Eaton. But he never saw her strike his wife ; nor did his wife, while in the asylum, make any such assertion, nor did any person tell him of this fact until nearly a year after her return home. His wife then, for the first time, communicated the fact to him.
He further testified that he saw on one occasion, fresh blood issuing from his wife’s mouth, which he also believes was the result of violence done to her throat by the "unwarrantable jamming of a spoon or some other rough instrument in the hands of the said Jane Eaton.” No other person told him of this fact, save Ms wife, nor did she till nearly a year after her return home. Mr. Norton’s testimony is, therefore, largely hearsay, and in law does not even amount to presumptive evidence.
Mrs. Norton’s testimony is to the effect, that while she was in the institution at Bloomingdale, she thought she was surrounded by bad people who would injure her, and that in consequence, she dared not make any complaints while there, even to her husband; that she refused to take food, because she believed it would injure her children, and that thereupon she was forced to do so by the attendant, Jane Eaton ; that said Jane Eaton, in order to intimidate her solely, and to punish her for refusing to take food, was in the habit of calling for a large spoon, which she would then thrust, with the convex side up, into the witness’ throat, at the same.time moving it up and down, whereby her tMoat was injured and permanently disfigured. (The throat of Mrs. Norton, on being examined by Drs. Sands and Choate, both experts, shows that it has been lacerated, and that adhesions have taken place between the right lateral margin of the velum palati and the uvula.) Mrs. Norton further *244 testified that Jane Eaton deliberately jammed her wrist several times in the crack of the room door, drove her naked through the ward to the bath-room and back,, and frequently used opprobrious language to her. She admits that she never stated any of these things to her' husband while he visited her at the asylum, nor until nearly a year after her return home, but explains this-by saying, that her sister advised her, that, by waiting,, her mind would grow stronger and better able to recall all these events.
On the part of the respondents, it is admitted that Mrs. Norton was a patient in their asylum during the time set forth by the relator, and that she was discharged therefrom while still uncured of her insanity that she was at one time very weak, and under such delusions as to forcibly refuse taking food, whereby her life was seriously endangered; that it became necessary, in order to save her life, and as part of the Legal duty of these respondents, to feed her by such coercion as would overcome her resistance; that this-duty was assigned to Jane Eaton, an attendant, who-had been employed as such for fourteen years in their asylum ; that said Jane Eaton was accustomed to the performance of such a duty, and that they had every reason to believe her possessed of the necessary skill, prudence and experience to discharge it; that no charge of neglect, unskillfulness or harshness had ever before been made against her, and that in the duty of feeding Mrs. Norton, she had always been aided by Jane Gordon, a fellow attendant in the ward, who was also, in their opinion, trustworthy. The respondents further showed that they never knew of any injury being done to Mrs. Norton’s throat while in their care and custody; and that by the experience obtained from the daily events transpiring in their asylum, they had reason to believe that the bruises seen upon the face and neck of Mrs. Norton, were inflicted by other patients, whom *245 ■she had annoyed by seizing hold of them, through her •delusion that they were her husband or children.
They admit that it is possible Mrs. Norton’s throat may have been injured during the process of feeding her against her wishes, and by force exercised to overcome her own resistance, but they submit that the act ■of so feeding her was necessary to save her life, and •constituted an essential part of the medical treatment, which they were, by law, obliged to furnish, and that it could not have been omitted or performed in any ■other way, without a greater risk to her life. They also introduced several witnesses, to show both the good character as well as the habitual disposition of ■Jane Eaton for kindness, fidelity and patience, evinced towards the insane of all classes ; and showed also, by the testimony of Dr. Choate, an expert in insanity and long in charge of a large insane asylum, that injuries to the mouths of insane patients, when such patients forcibly resist taking food, and coercive measures in -consequence have to be employed, were liable to happen, and were not, therefore, of infrequent occurrence. Dr. Brown, the superintendent of Bloomingdale, also testified to the same fact. But neither of them had seen a case precisely like that of Mrs. Norton’s throat. They, however, gave it as their opinion that such an injury was quite possible under the circumstances of forcibly feeding a refractory patient, and thought this the most rational theory whereby to account for the injuries in question.
Looking over the field of this evidence, it is manifest that all the acts done to, and injuries alleged to have been inflicted upon Mrs; Norton, must have occurred in the privacy of the ward, and that there were but three witnesses to them, viz.-, Mrs. Norton, Jane Eaton and Jane Gordon.
The veracity of none of these witnesses has been impeached, and each is entitled to credence to the *246 extent of her knowledge of facts, or to the distance of her interest from the issue involved in the case. One of these witnesses, Mrs. Norton, was insane at-the date' of the occurrences which she related, and her testimony in law cannot be accorded the rank oí primafacie evidence. It is at best only secondary evidence ; but this distinction, which is a purely legal one, affects the quality and not the strength of the proof; for if circumstances otherwise corroborate the proof and show that its existence is consistent with no other theory than that set forth in the allegation, then the proof may be said to be established.*
Now the capacity of any human mind to rightfully interpret events occurring about it depends upon a trained perception, an unclouded judgment, and an absence of all subjective relation to the matter under examination. Necessarily, also, every adult human being is steeped in his own temperament—wears the livery of his ordinary mental states—and exhibits the color of his predominant moral feelings. All these factors habitually enter into and may infect the subject matter of a judgment, and thus may put limitations upon its freedom. We acknowledge this when we say that no man is a good judge in his own case, and the law recognizes these springs of human action, when it determines that no man shall try his own case.
Thus when a person who has once been profoundly insane and has apparently recovered his reason, undertakes to describe with particularity events occurring during that period, we are compelled to scrutinize such statements, not from a standpoint of'veracity so much as from one of intellectual competency; because we *247 know that insanity permanently enfeebles the mind, and that an act of self-introspection involving memory becomes thenceforth more difficult; and because, also, in the effort to perform it, the mind is apt to fall into the oldest worn channels of thought—-those, in fact, which, were most used during the period of its greatest insane activity.
In consistency with this law of our mental constitution, which is both recognized and engrafted upon our municipal code, we cannot but regard the judgments of the insane, in all matters affecting their personal feelings, as peculiarly liable to error. Such mental efforts are generally wanting in capacity for comparison and in freedom from self-enslavement—therefore in certainty. They all, more or less, exhibit the distorting influences of a disease whose overshadowing feature is its tendency to confound the subjective with the objective. It is not the fault of the insane, therefore, if their judgments on personal matters are so often bound up in adamantine fetters of conviction, forged in the workshop of imagination rather than of demonstration. This was the reason why the common law anciently rejected the testimony of the insane as incompetent in itself to enlighten a judicial inquiry, unless such lunatic was in the enjoyment of a lucid interval, but not otherwise, since in matters of evidence no degrees of lunacy were anciently recognized at law, and in several cases a lunatic was treated as a dead person, so far as his competency to testify was concerned (Coke Litt. 6, a; Ib. 247; Carrie v. Child, 3 Campb. 6, 282; Adams v. Ker, 1 Bos. & P. 360; Bennett v. Taylor, 9 Vesey, 381; Comyn Dig. Testimoigne; Grotius J. B. et P. Lib. 2, c. 13 § 2).
But these rulings belong to a day when few, if any, insane asylums existed in which to immure such persons, and expose them to the possibilities of undiscoverable outrage. And it will be observed that none *248 of these decisions touch the point now before us, relating to the competency of one testifying to events occurring during a period of past insanity. We are left, therefore, to seek the law governing the value of such evidence in natural equity enlightened by mental philosophy, since with the change of circumstances produced by the erection of asylums, containing in the aggregate thousands of lunatics, has also come the necessity of relaxing the old rule and allowing them to testify in their own behalf whenever found competent.
Courts have always looked with distrust upon the testimony of the insane, because of its generally misleading character. Nor will this appear surprising when we recall the disturbing influences produced by insanity upon the moral as well as the mental faculties. From the earliest of our decisions touching the competency of such evidence (Livingston v. Kiersted, 10 Johns. 362, A. D. 1813; Hartford v. Palmer, 16 Id. 143, A. D. 1819), down to the present day, this form of evidence has never been considered prima facie proof whenever any other relating to the same series of facts could be obtained. The reasons for this are aptly set forth in the case of Holcomb v. Holcomb, 28 Conn. 181, A. D. 1859, where the court, commenting upon the value of such testimony, said :
“ The inlets to the understanding may be perfect, so far as any human eye can discern; the moral qualities may all be healthy and active ; the conscience may be sensitive and vigilant, and the memory may be able to perform its office faithfully, and yet, under the influence of morbid delusions, reason becomes dethroned, false impressions from surrounding objects are received, and the mind becomes an unsafe depository of facts.......
“ The force of all human testimony depends as much upon the ability of the witness to observe the facts correctly, as upon his disposition to describe *249 them honestly ; and if the mind of the witness is in such a condition that it cannot accurately observe passing events, and if erroneous impressions are thereby made upon the tablet of the memory, his story will make but a feeble impression upon the hearer, though it be told with the greatest apparent sincerity.
In 1851 a case arose in England which required a relaxation of the common law doctrine, excluding the testimony of the insane. There, a patient in a lunatic asylum was so grievously assaulted by an attendant named Hill that he died of his injuries. Hill was thereupon indicted for murder, and a lunatic named Donnelly, who was one of the witnesses to the assult, was, after examination by the court as to his competency, allowed to testify. Exceptions being taken to this on a case reserved, the judges were all of opinion that no error had been committed, it being held that the admissibility of such evidence was to be left to the discretion of the court, since there was no unvarying principle by which to govern such cases (Regina v. Hill, 2 Denis, C. C. R. p. 254, A. D. 1851; 3 Dowl. Pract. Cases, 161 ; Temple & Mew, 582 ; Kendall v. May, 10 Allen, 59 ; 1 Whart. Cr. L. 752). In this case, Donnelly being the most intelligent witness to the assult, no better testimony could be adduced, and the facts testified to not relating to himself, no motive for mis-statement or exaggeration could reasonably be imputed to him. Whether he would have been deemed a competent witness in his own case is a matter upon which the court did not express any opinion.
Except in the case above cited I cannot find a single instance where a lunatic, not in a lucid interval, was admitted to testify before a court. In the only instance which approximates to it, viz.: Exp.-, 3 Dowl. Pr. Cas. 161, a party applied for a habeas corpus to bring up a person, who was confined in a lunatic asylum for the purpose of producing him as a witness. *250 The affidavit stated that he was rational. The court held that the writ could be granted if the party was in a fit state to be removed, and was not a dangerous lunatic. Both these cases, however, go to the extent, only, of showing that where no better testimony than that of a lunatic exists, it is competent to offer him as a witness, leaving the court to decide upon his admissibility. But the common law doctrine remains nevertheless unchanged, wherever it can be applied without hindrance to justice.
The reasons for this exclusion are well stated by Mr. Shelford, who, in his Law of Lunatics and Idiots, p. 621, says in confirmation .of this doctrine that “the ground of excluding the evidence of insane persons, in courts of justice, requires little or no illustration, for it is obvious that they are altogether unfit to communicate such information as can be relied upon, or will afford a motive to assent in any case, and much caution is required in admitting persons who are sometimes insane to give testimony in a court of justice, even during their lucid intervals. When, indeed, the intermission of the disease has been long, and the facts concerning which the evidence is required are of recent occurrence, and no access of the disease has followed, evidence of the facts to which such a witness deposes ought to be received, more especially if other witnesses to the same point cannot be obtained; but such evidence is liable to great suspicion, and will not perhaps be entitled to receive full credit, except in conjunction with and as corroborative of other proof.”
It is upon these two last mentioned principles, viz: that no other witnesses to the same point could be obtained ; and second, that it was corroborative of other proof, that the insane witness, Donnelly, was allowed to testify, in Regina -y. Hill, and it is because of these same existing conditions in Mrs. Norton’s case that I have felt it proper to admit her testimony. Neverthe *251 less, since a period of insanity has always been considered at law as one of civil death from which prima facie proof conld not be elicted, great doubt must necessarily attach itself to the evidence of persons, who, having nominally recovered from a state of insanity, seek to-testify to facts occurring during its existence.
Assuming that Mrs. Norton is admissible to testify to facts occurring since her removal from Bloomingdale, or to facts occurring previous to her insanity, it still leaves the question of how well she remembers what happened during the period of that insanity. Her real competency to testify turns upon this. It is admitted that she was legally committed as a lunatic to that asylum, and was removed therefrom while still uncured. Nearly two years have elapsed since this event, but whatever changes for the better may have occurred in her mind it is not in accordance with the laws of memory that impressions should grow fresher with the lapse of time. The reverse is, in fact, the case, for as Locke has beautifully expressed it: “The pictures drawn in our minds are laid in fading colors, and if not sometimes refreshed, vanish and disappear” (Book 2, ch. 10). If this be the law governing the action of healthy minds, are we authorized to assume that this law wholly suspends its action in disordered minds % Or, in other words, can we assume that the memory gathers strength from the weakness of the organ which gives it expression ? I can find no authority for such an assumption. Consequently, what may have been the range and what the limitations of Mrs Norton’s powers of memory during her insanity, and what they are now, become, in this connection, a very proper subject of judicial inquiry. For no presumptions of absolute recovery from a state of acknowledged insanity arise in law from the lapse of time alone. Something more than this is needed, and the burden of proof is on him who alleges it (Attorney-Gen. v. Parnther, 3 Bro. Ch. Cas. 443 ; Peaslee v. Rob *252 bins, 3 Metc. 164; Hix v. Whittemore, 4 Id. 545; Shelford on Lunatics, 275 :1 Greenl. Ev. § 42).
It has been, therefore, the invariable practice of courts to make this inquiry as a condition precedent to the admissibility of the witness. It was so done in Regina v. Hill, above cited; it was reaffirmed in Spittle v. Walton, 40 L. J. Ch. 368; and again in one of our own courts, in Campbell v. State, 23 Ala. 44, where Chief Justice Chilton, speaking to the point, said that “the question was, whether the witness, conceding him to have labored under mental delusion at a previous period, was, at the time of the trial, of sound mind.” In Mrs.,Norton’s case, it seemed to me the more equitable way to allow her to testify in her own behalf, without previous examination, leaving that testimony to stand or to fall, as a test of her mental competency, according as it squared with itself, and was corroborative of facts otherwise circumstantially established.
The problem now before us, therefore, is to determine whether any lingering mists of insanity still obscure her mental vision, and whether the incidents to which she has testified are facts, recollected by her memory from objective data, or are the offspring alone of a belief of their having happened, together with such frequent self-repetitions of that belief as to fix them upon the mind as events having had a real existence. Experience teaches us that an insane impression, like the memory of a dream, may hover for years indistinctly in the mind; and the fact that we find it there is no proof of its reality, but only of its persistence. By frequently recalling its outlines we gradually intensify its complexion, until it attains to proportions and to a distinctness never existing in the original. The baseless fabric of a cloud thus appears like a continent of matter, and becomes a tangible fact to the eye of the subjective beholder. In its natural state, the human mind is constantly passing through regions of *253 fact and of fiction; is constantly besieged by intrusive ideas, which require power to control them, and education to utilize them.
Even the healthy intellect may delude itself unconsciously. The biographer of Charles Dickens asserts that while writing his inimitable fictions the author heard the voices of his imaginary characters speaking the words which he placed in their mouths. So true it is that in the workshop of the imagination the mind may give to "airy nothings a local habitation and a name,” and thus many ideas of things, by long nursing, grow to become what at first they only seemed.
It is evident, therefore, that sane or insane, we see at best but "through a glass, darkly,” and constantly need to use that natural logic which Cod has given us as a guide and rectifier of our mental processes. Hence the law of testimonial evidence recognizes a difference between knowledge of a fact and belief of a fact; between an incident which may be simply personal and subjective, and an event which is objective and demonstrable. The probative force of demonstrative knowledge, is, in the absence of perjury, unqualified and conclusive. It is evidence of the highest order. The probative force of a belief, however intense or sincere it may be, only equals that of an inference. It is at best but a conclusion drawn from a postulate not yet established outside of the mind of the believer.
A number of witnesses were introduced to testify to the excellence of Mrs. Norton’s memory, both before and during her stay in the asylum, and many facts were stated by her relating to this period which were fully corroborated. But this excellence of memory in several particulars, does not justify the conclusion that it was so in all. It is well known that memory, even in the sane, is the most treacherous of all faculties. A person may have an excellent one of dates and names, yet at the same time have a very poor *254 one of faces and persons. Mental philosophers accordingly make a sharp distinction between capacity of memory and power. To the former they ascribe a retentive memory, to the latter a ready one (Stewart Phil. of the Mind, 248). Mrs. Norton seems to have been gifted with a retentive memory, of which, however, she evidently lost the power while insane, for she constantly mistook day after day, the same persons for her husband and children, although as constantly reminded of her error by these very persons. Whatever may have been the portion of her brain affected, it is certain that it so impaired her physical sensibility and her power of attention, that no fixed impressions were made upon her mind by external causes. It was, like that of most maniacal patients, in the condition of a photographic plate, between which and the sunlight groups of miscellaneous and over-lapping images are constantly passing. Distortion of that imagery was the inevitable result.
These phenomena are so commonly observed in insanity, that they may be considered concomitants of that disease. Nor are their effects often recovered from, to the extent of a plenary restoration of the memory.
Although testifying with great confidence in the accuracy of her memory, Mrs. Norton still showed her present distrust of its power, by bringing a memorandum to the witness’ chair with her. This fact did not surprise me. It simply convinced me that she was yielding to the necessities of a mental law, without being conscious of it. On the one hand, she was asserting in her own evidence, and that of others, the infallibility of her memory—while on the other hand, she was seeking aid to sustain it.
We have seen from the evidence, that while insane, she lost all memory of the persons of her husband and children, mistaking men and women indiscriminately *255 for them, and although she testified that Jane Eaton deliberately jammed her wrist several times in the door, Dr. Burrall testified that on several occasions, he unconsciously closed the door upon and pinched the fingers of Mrs. Norton, who had thrust them into the crack, without her being conscious that anything had touched them. Mrs. Norton, testifying to facts occurring during her insanity, is thus flatly contradicted by Dr. Burrall. Again, her delusion that every man or woman she met was her husband or children, was not dispelled by her seeing such men or women daily. The delusion was fixed. Now what was its area 1 No one can tell, not even herself. Was it limited to one category of ideas, or did it embrace many? We can never know a priori. We can only infer from experience of its conduct.
In undertaking to solve this problem, it is well to recall that law of the association of ideas from which we learn that the mind does not consist of compartments with impassable walls between. It is more truthfully comparable to the ocean, where, although we have millions of waves, we have but one common mass of water. The tidal wave created by a volcanic eruption on the coast of Chili, is next day felt on the coast of China. Has it traveled that immense distance in so short a time ? Assuredly not. It is felt there only as the transmitted percussion of an original impulse, and the inhabitant of China may not only be ignorant of the place where the wave started, but more so still, of the cause which produced it. So, too, in the operations of the human mind, we cannot always tell whence an objective idea comes, nor what gave it birth. We often only know that it has come because we find it there, and if we can give no reasons outside of ourselves for its existence, we cannot be said to know accurately the world about us.
In trying to form any estimate of Mrs. Norton’s mental capacity we find it proved that while insane she *256 constantly confounded and mistook persons. Familiar as her husband’s and children’s faces must have been to her, she yet was daily mistaking other persons, with whom she was in hourly contact, for them. She states that Jane Eaton frequently struck her in the face. She does not say that any one else did. Yet Dr. Brown states that he has Seen patients strike her in return for* her seizing them. Has Mrs. Norton forgotten this ? It seems reasonable to conclude that she had no knowledge at the time of these events, or of who it was that struck her. And if she had no definite knowledge of such facts can we concede that in thinking it was Jane Eaton who struck her, she was cabable of judging rightly ? The law demands moral certainty in evidence. It cannot convict upon presumptions alone. Mrs. Norton thinks because she remembers a few things relating to her asylum life accurately, that she must remember necessarily all things. But we have seen that Dr. Burrall and Dr. Brown, both testify that she did not remember two of the plainest and most visible facts that can occur to a human being, both facts also being; usually accompanied by a sense of pain.
In the case of a sane mind the fact would be surprising ; but it is not so with the insane, in whom such things are of common occurrence. Which of these witnesses shall we believe? Mrs. Norton testifying to incidents which she believes she saw, while the shadow of an eclipse was upon her mind, or Drs. Burrall and Brown, who saw as ordinary healthy minds see.
But the chief wrong charged by Mrs. Norton against her attendant, Jane Eaton, is that she was in the habit of deliberately thrusting a large spoon into her throat, and moving it up and down as a punishment for her unwillingness and resistance to being fed. This she' affirms occasioned laceration of her throat, and the permanent disfigurement which now exists. In making this statement she fails, however, to give us sufficient *257 details of these occurrences to enable us to judge exactly what happened during this performance of being fed. Did she cough? Did she strangle while the spoon was in her throat ? Did she know all that occurred ? And since she is a truthful person and was permitted to make her statements at full length, I cannot but infer that her omission to give any particulars touching her injuries arises from the fact that being then confessedly insane she did not know clearly nor entirely what was passing on around her. The four experts who examined her throat' are of opinion that the injuries done it might occur from her forcible resistance to being fed. They cannot explain it upon any other hypothesis. They also say it might occur without the agency of criminal intention.
Now Mrs. Norton admits resisting forcibly the attendants who were feeding her. She admits that they had to force open her mouth, and that she struggled against it, moving her head so as to embarrass those who were engaged in feeding her. It is evident she was not passive, but performing contributory acts, which might, in the opinion of experts, become the causes of self-inflicted injuries. Being at that time insane we cannot properly apply the doctrine of contributory negligence to her acts any more than to those of a child. In either case they are the acts of an irresponsible agent. But it would be against all equity to-allow any person to derive an advantage from his own hurtful acts. No one can be- allowed to profit by his own wrong, nor to charge his self-produced misfortunes to the disadvantage of another.
But apart from the effects of this internal evidence, thus casting distrust upon Mrs. Norton’s credibility, it so happens that Jane Eaton was not the only person present at these forcible administrations of food. Jane Gordon, another attendant, was also present on all these occasions, and rendering aid; and although she *258 participated in restraining Mrs. Norton’s resistance, she never, as she states, saw Jane Eaton use any violence while feeding her, either before or during the act. She saw Mrs. Norton resist, and saw Jane Eaton force open her mouth with a large silver spoon, but never saw her thrust it into her throat or move it up and down. Here again are two witnesses against one, and these two not impeached.
The preponderance of evidence is thus seen to be in favor of contributory acts on the part of Mrs. Norton, causing injuries without her consciousness of the method of their occurrence.
From this mass of conflicting testimony, which has here been reviewed, and weighed in the balance of probabilities, we are led to certain conclusions of fact, to which it is now my duty to apply the same principles of law which govern courts in estimating the value of circumstantial as well as testimonial evidence.
It is necessary, at the outset, to bear in mind the relations subsisting between Mrs. Norton and Jane Eaton. The former was an insane patient in charge of the latter, whose duties varied with the incidents of the patient’s disease. On one day she might need restraint, on another, not; on one day she might require feeding by force; on another, not. For the purpose of properly discharging these duties to Mrs. Norton, Jane Eaton was constituted the lawful agent of Dr. Burrall, having his authority to act in the manner directed by him. The act of feeding Mrs. Norton was in every sense a lawful act,, between which and an unlawful act, the law makes a great difference in personal responsibility for any mishaps which may occur thereby. Therefore, no presumption of malice attaches itself to an injury occurring in the course of a lawful act; and the burden of proof rests upon him who alleges it. But, if it be an act involving skill and the party charged has .contracted to furnish it, then a presumption of negli *259 gence arises out of every direct injury thence issuing ( Wharton on Negligence, § 26 ; Dig. L. 16, 213, 2; Institutes, Lib. 3, tit. 24, Sander’s Ed. p. 466; Stanton v. Bell, 2 Hawks, 145).
In the treatment of diseased persons, however, we are dealing with moral agents having more or less freedom of action, and the services of a physician or nurse •cannot be fully discharged without some concurrence on the part of the patient. In other words, the duties of the patient are subjective as well as objective. It must be borne in mind that we have to treat not simply a sick animal nature, but a sick animal nature influenced by a will power acting, as in the instance of the insane, very often against the interest of the individual’s well-being. The contract under which the physician or nurse acts, particularly in the case of the insane, may be said to lack the most essential of ingredients in an agreement for medical treatment, viz. : the ingredients of confidence and co-operation. A man who renders me a service against my will cannot be said to be my agent. ' Hence as most of the insane are under compulsory medical treatment, they cannot be assumed to ■occupy the same moral and fiduciary relations to their medical attendants as do the sane. The are not bound to co-operate with their medical attendants in securing a cure in their own persons, as sane patients are, and their neglect or unwillingness to do so cannot be imputed to them as contributory negligence in an action for malpractice, any more than to a child.
And yet, since insanity at law is a term of variable significance, covering very different shades of mental unsoundness, I am not prepared to say that there could not be a phase of it in which a patient might be capable of such negligence as would amount to contributory wrong on his part. But in any case, no man can be permitted to profit by his own error, however void of intentional wrong that error may be. To the extent *260 of his responsibility, he is responsible, and it has never-been questioned, therefore, that an insane person was-responsible in damages for torts committed to property (Broom’s Com. on Common Law, 684, and cases cited).*
Nor in the relations of insane patients to their lawfully constituted attendants, can it be contended that, in injuries occurring to themselves through their violence and resistance to proper medical treatment, the-entire responsibility for such wrongs rests upon their custodians. No one would be willing to assume the-care either of children or lunatics if they thereby assumed responsibility for every possible accident which might befall them. The law imposes no such unreasonable obligations upon anyone, and expects in turn no impossibilities from them. It considers the-relations of the parties to each other, and apportions responsibility according to possibility, intention and evidence of good faith in conduct.
The presence of insanity does not change, in law, the presumption that its subjects are still human, nor-that they enjoy a certain power of choice in actions purely self-regarding. Principles of law may have-necessarily to be modified in their application to them, but these principles are not thereby extinguished. Speaking of the duties of all patients, independent of their mental condition, C. J. Lewis, of Pennsylvania, said: “It is the duty of the patient to co-operate with his professional adviser, and to conform to the necessary prescriptions; but if he will not, or under the circumstances he cannot, his neglect is his own wronger misfortune, for which he has no right to hold his surgeon responsible. No man may take advantage of his own wrong or charge his misfortune to the account *261 of another (McCandless v. McWha, 22 Penn. 268). And this doctrine was substantially re-affirmed in our •own courts, where it has been decided that if the injury was due to the plaintiff’s fractiousness and disregard •of the defendant’s orders, the latter being judicious, no action would lie (Carpenter v. Blake, 60 Barb. 488).
It will be observed also that neither Mr. Morton, in the remarks made by him introductory to his sworn testimony, nor Mrs. Morton, in her evidence, charge Jane Eaton with negligence, unskillfulness, or any delinquency as an agent or servant of the institution while engaged in feeding her, but allege that the act of thrusting the spoon into her throat was an act of deliberate personal malice, intended as a punishment. Mow the probative force of any testimony will always depend upon its agreement with a state of facts which, the contrary, if established, would negative; and it is a well recognized principle in the law of presumptive evidence that “where,” in the language of Mr. Green-leaf, “ a criminal charge is to be proved by circumstantial evidence, the proof ought to be not only consistent with the prisoner’s guilt, but inconsistent with any other rational conclusion ” (1 Greenl. Ev. § 34; Hodge’s Case, 2 Lewin, C. C. 227).
Even taking Mrs. Morton’s throat as evidence of injuries inflicted, it is more consistent with the experience of the accidents to which refractory patients in asylums are exposed when fed by force, and as testified to by Drs. Choate and Brown, to infer that an injury did, in fact, so occur to Mrs. Morton, of which, though largely contributing to it herself, she was not at the time wholly, if at all, conscious. In the absence of positive proof, therefore, that such injury had a criminal origin, I am constrained to form my judgment upon that exculpatory presumption which requires that, in the absence of contrary proof, the act shall be referred to *262 the operation of the least guilty motive (Wills Circ. Ev. 157).
Under these principles it seems settled that charges like these now before me must be proved to the same degree if they cannot be in the same manner as other charges of a similarly criminal character. Neither presumption nor inference of wrong arises merely from the custodial character of the relation subsisting between Mrs. Norton and Jane Eaton. To permit such a presumption of fact as that to arise, would be to accuse the State of placing its helpless citizens purposely in circumstances where they would be exposed to wrongs without remedy, and to oppression under the disguise of humanity.
It is impossible for me, therefore, under any rule of legal evidence, to cast out the testimony of an unimpeached witness like Jane Gordon substantially corroborating Jane Eaton in all essential facts. If Jane Gordon is to be believed, and I have no right to disbelieve her, her testimony gives a preponderance to the moral evidence in the case which negatives Mrs. Norton’s charges. And if proofs of previous good character form part of a legitimate answer to such charges also, then they further give weight to the defense, under the well-established rule that “in forming a. judgment of criminal intention, evidence that the party had previously borne a good character is often highly important, and if the case hangs in even balance should make it preponderate in his favor ”(Wills on Circ. Ev. 164; Reg. v. Frost, Gurney, 749).
And even were I to exclude character as having any weight in an issue of this kind—a step I could not take without violating every principle of justice, and exposing myself to the charge both of ignorance as well as bias, I should still find myself confronted by a rule of judgment founded in natural equity, and which has constantly guided our courts in deciding that “in order *263 to justify the inference of guilt, the inculpatory facts must be incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt” (Wills Circ. Ev. 188).
If I have given greater latitude to the discussion of Mrs. Norton’s testimony than the real merits of this investigation would seem to justify, it is because of the fact that it involves, as before stated, an important point in the law of evidence which has not yet been settled by our courts. Persons are every day discharged from our lunatic asylums as either cured or uncured, and taken back into the bosom of society to resume their civil relations to it. Assuming that their capacity to testify to recent facts is re-established, what, it may be asked, are the retrospective limits to that capacity? Does it go back indefinitely so as to include the period of their insanity, or shall we apply the maxim of falsus in uno falsus in omnibus to it ?
We have seen in Mrs. Norton’s case the juxtaposition of error with truth in the store-house of memory, the dividing line being that subjective one on the thither side of which we see as we feel, and we recollect from our belief rather than from self-demonstration. Without entering, however, into any analysis of the opinions of alienist physicians, touching those nervous centers whose diseases seriously disturb the memory, either partially or wholly, it is practically sufficient for the law to determine whether any physical and uncontradicted fact exists from which such a witness as Mrs. Norton can begin her testimony. If it does, she has a right to be heard; if it does not, then her evidence has no objective foundation on which to rest, and is amenable to the suspicion of self-deluding error.
The question, therefore, is not one of Mrs. Norton’s veracity, which no one disputes, 'but whether she has produced that amount "of proof which is required at *264 law to substantiate her charges. Judged by all the above established rules of evidence, it must be conceded that she has failed to sustain her allegations.
Again, Mr. Norton charges among the other abuses to his wife, that of putting on a straight-jacket, and detaining her needlessly in bed. Now, I presume it will not be contended that, in the case of a lunatic, such an act is in itself an abuse. Restraint of insane patients has everywhere been regarded as, at times, necessary, and whether the method be by hands. of attendants, or by mechanical appliances, the question of its fitness has always been considered one exclusively falling within the province of the attending physician. In the United States, the use of the camisole and straight-jacket has been regarded by experts as the simplest and least hurtful form of mechanical restraint, and under existing states of opinion it may be considered settled that the confining of a patient in one would not be considered in itself an abuse. Whether in a given instance it was put on too tight or too loose is a question of fact, not affecting the more general question of the system under which it was done—or the legal right to do it. So, too, the detention of a weak insane patient in bed, for a longer or shorter time, is often a necessary part of their medical treatment, and a question whose determination is very properly left to their medical attendants. No layman has the requisite knowledge to draw any inference from it.
But whatever may be the absence of proof of any criminal wrong having been done to Mrs. Norton’s threat, the circumstances connected with the fact of such an injury, coupled with want of knowledge of its existence by the physicians in charge of the Institution, until a year after her removal, are incidents of asylum life which demand some official notice on my part. It cannot be denied that much of the public sensitiveness relating to the possible grievances of the insane *265 in asylums, arises, not from any personal distrust of the boards of managers or physicians of these institutions, both which generally represent gentlemen of the highest integrity, capacity and loyalty to their several trusts, but solely from the knowledge that the ultimate execution of the orders of these gentlemen, and, consequently, the ultimate results for good of such institutions, depend practically upon the character and fidelity of attendants.
Looking at the powers of personal custody, control .and moral influence over the insane which are delegated to these attendants; looking also at the necessary seclusion and privacy under which their services must be rendered in order to be efficacious; and looking lastly at the character of these services so taxing to patience, endurance and charity, it is not surprising that the public should deem it impossible, when relatives «of an insane person cannot endure his presence at home —that strangers should be kinder and more forbearing with him in the privacy of an asylum. It is idle to ■criticise this as sheer ignorance ; it is wiser to confess that it is a feeling of human nature which we must respect, because born of our affections, while at the same time it is our duty to allay the distrust which so naturally springs from it, particularly when any accidents occur to the insane.
Disbelieving, however, in the theory of accidents, as popularly called, it has seemed to me that with the acknowledged skill and experience of Jane Eaton, she should have prepared herself for such contingencies as might arise in the course of feeding a patient like Mrs. Norton. The law requires of all persons whose contract for personal services involves the elements of skill, that they should couple with this a degree of diligence proportioned to the difficulties of the task undertaken. Skill and diligence are indissolubly associated in law ; and while the absence of the former *266 constitutes fraud, the absence of the latter constitutes negligence.
It is difficult to believe that the accident to Mrs. Norton’s throat can have entirely escaped the notice of Jane Eaton. Such an accident, involving laceration of one-half of the throat, with subsequent acute inflammation, resulting in adhesions of the uvula to the velum palati—such an accident must have so altered the anatomical proportions of the parts, as to have seriously impaired their functional activity. There must in consequence have been swelling, with extreme tenderness on swallowing; there must have been great difficulty in articulation, and manifest alteration in the tone of her voice. Some of these symptoms, if not all, must have been present for over a week. Dr. Sands says in his testimony that it would require two weeks for the throat to recover from them. Yet during all this time, she does not appear to have made any complaint, and none of those about her, although feeding her and conversing with her daily, discovered any indications of her injuries. This is, to say the least, very remarkable ; and in seeking for an explanation of it, we are placed between two alternative propositions, for either Mrs. Norton was so insane that her sensibility was seriously blunted, and that she showed no suffering, or else Jane Eaton knew of the accident and concealed it. It is not necessary, in order to constitute negligence on her part, that she should have known its extent. Nor was she to wait until Mrs. Norton revealed her injuries before taking cognizance of them officially. The civil and the common law, alike, place the helpless infant and the senseless lunatic upon a similar footing. Though neither complain, both may be the subjects of wrong (Itaque pati quis injuriam, etiamsi non sentiat, potest. Dig. 47, 10, 1, § 1).
When she saw blood issuing from Mrs. Norton’s *267 mouth, or saw Mrs. Norton swallowing or speaking with increased difficulty, those facts should have put her upon inquiry into their cause. The law placed her there for the purpose of anticipating harm to the insane, as well as checking it when it came.
There is no evidence, it is true, that she knew of the injury as such, but that does not exonerate her from the duty of constantly being on her guard, and of ascertaining daily, whether, in the midst of such struggles and resistance as Mrs. Norton made, no injury followed when a spoon was thrust into her mouth. Every intelligent nurse must know that in performing such duties as feeding a refractory patient with a spoon, some risk is incurred ; and though an accident may happen without blame to an attendant, not to discover such accident affords a just ground for doubting either her skill or her vigilance. There may be wrong done by neglect of watchfulness as well as actual commission, since the result in either case may be similarly disastrous.
I do not think the managers of any asylum should allow an accident as serious as that to Mrs. Norton’s throat to pass by, without some reprimand, at least, to-the attendant, within whose field of duty such accident has occurred. Length of service alone, or even good character, should not diminish responsibility. And while there may be no just reason to condemn, where there is no positive evidence of guilt, there is alway reason to admonish, wherever there is ground even of a suspicion of negligence. Ordinary diligence is not sufficient in the case of the insane. The delicacy of the trust, and the perilous contingencies which surround it, require the most unrelaxing vigilance. Any want of this constitutes, at law, a dereliction of duty.
I believe it is generally conceded by the superintendents of our asylums that even the oldest attend *268 ants require constant supervision. They believe this to be necessary, because it is in the nature of all services of such a character as theirs to render the execution of • them after a while somewhat perfunctory and mechanical. This is the reason, I find, why many' superintendents prefer to employ new attendants, rather than to take those who have grown old in the service of other asylums. I do not think the reason a logical one, since on general principles an experienced attendant of good ■character should be a safer one for the insane than a novice. The better reason, I fancy, is to be found in the fact that too much confidence is apt to be reposed in an old attendant merely from the length of service alone, and vigilance on the part of physicians is thus unconsciously permitted to be relaxed. The attendant speedily perceives this, and, in proportion as authority is conceded him without frequent interrogation as to its use, he gradually assumes more by the negative permission of being unchecked. In this way he ultimately comes to see and to report only what he pleases in relation to the daily condition of the patients committed to Ms care. Now in order to obviate this tendency to exclusive reliance upon the attendant’s caprice for a history of the patient’s life in the asylum, the law of 1874 makes it the duty of every superintendent of an asylum ' ‘ to make entries from time to time of the mental state, bodily condition and medical treatment of such patient, together with the forms of restraint employed during the time such patient remains under his care” (chap. 446 of 1874 ; tit. 1, art. 1, § 4).
If Jane Eaton had more fully communicated from time to time, the events belonging to Mrs. Norton’s ■conduct, we might have had some clue to the date, and possibly such an explanation of the occurrences which led to the injuring of her throat, as would have rendered this investigation unnecessary. But as no *269 such details appear upon the case-book of the asylum, T must infer that no particular facts relating to Mrs. Norton were communicated by her to the physicians, or else they would have entered them there, in compliance with the provisions of the statute.
It seems to me, therefore, a proper time to suggest that more particular reports should be required from attendants daily—that they should be instructed to report fully, every occurrence in the conduct of their patients, as forming in fact a symptom of their disease and an exponent of their varying condition. It is not for them to judge what to tell or what to withhold in such matters. They should act only as mirrors and messengers, to represent the patient’s condition to the physicians in charge.
The more we look at the sphere of duty and the personal jurisdiction over patients which must necessarily be intrusted to attendants, the more we become impressed with the conviction that they, of all other officers in an asylum, hold the keys of its fortune in their hands. Whatever may be the skill or diligence of physicians, however untiring may be the vigilance of managers or their visiting committees, all these may be practically neutralized at the very threshold of their wards by the individual infidelity of an attendant. Physicians cannot always be present—neither can they well avoid visiting their patients at certain definite times, which ultimately become known, and preparations are accordingly made by attendants, both of patients and rooms, to have them seen and inspected. Nevertheless, the law of agency constructively assumes that every act done in those wards by an attendant is done by the managers of the institution. Qui facit per alium facit per se. The privity of contract subsists directly between the managers and the party who places a lunatic in their keeping, however many sub- *270 agents these managers.may employ (Thomas v. Winchester, 2 Seld. 397; Landon v. Humphrey, 9 Conn. 209).
It will be thus seen that a very heavy responsibility, often too heavy for the grade of intelligence on which .it rests, falls upon attendants, and a still heavier responsibility upon the managers, as their sponsors and principals before the law. I am myself often amazed at the facility with which managers confide the delicate task of caring for the insane to the persons I meet with in asylums as attendants. And since the grade of service in the labor market is generally determined by the salaries paid, it is our duty to first elevate the latter, if we hope to be able to elevate the former. The doctrine of retrenchment does not apply in any system of wise political economy to salaries paid for skilled labor. Whenever such labor is well done, the laborer is always worthy of his hire. And even as a switch-man or an engineer on a railroad has a more immediate control over the safety of its passengers than its whole board of directors, so in an asylum, an unfaithful .attendant may do a measure of harm which a whole board of managers cannot prevent.
It would seem, therefore, that for the better protection, both of the good fame of asylums as well as of the safety of the insane committed to them, more details of the daily life and occurrences to patients should be entered upon the. case-books of these institutions. This, indeed, is required by law, but I regret to say is not always fully complied with. Mrs. Norton’s case shows us the need of these daily records, in the absence of which judicial inquiries are compelled to grope their way through the labyrinths of circumstantial evidence.
And in order also to prevent all possibility of negligence on the part of attendants, it seems desirable that a person in the nature of a supervisor of attendants *271 should be employed in every large asylum. It should be his or her duty to pass the day in patrolling the wards, entering them unexpectedly ; being present at meals, and seeing that the attendants do not relax in their discharge of duty. By such means there would be a constant supervision, which at present there is not, of both attendants as well as patients. This person would represent the eye of the physician, while the attendant would represent the hand. Physicians cannot be constantly in their wards, nor with such an assistant to supervise their attendants, would they have any reason to doubt the faithful execution of their orders. The experiment above suggested has already been tried and with good success for the past year, in the male wards of the Willard Asylum. The patients find in such a person a friend, and, as they believe, a protector; and the attendants find in him and adviser and moral guide. I need not say what effect the knowledge that such a person is in the wards of an asylum must have towards quieting public apprehension.
There will always be suspicion of wrong-doing and abuse of the insane, awakened by accidents like that which has befallen Mrs. Forton. It requires but a slight indulgence of the imagination to paint them in dark colors, or to believe them matters of habitual occurrence. Such statements, also, when made in a plausible manner wear a similitude of truth, which is apt to take captive our feelings, ere we have allowed reason to reflect upon the probability of their improbability.
One of the chief objects underlying the creation of my office, was that of re-assuring public confidence in the fidelity of those to whose care it has confided the insane, by securing early investigations of all cases of suspected wrong. In the present instance every opportunity has been given both the relator and the respond *272 ents to make their allegations and to traverse them. And in arriving at the conclusions which I have, it has; been a satisfaction to perceive that both parties have-joined issue in a manner calculated to eliminate from the record all vindictive claims on the one hand, and all appearance of a technical defense on the other.
The respondents having also, through the chairman of their committee, Mr. Beekman, anticipated my action in the premises by themselves, soliciting suggestions, tending to the more efficient administration of their trust, I deem it sufficient to announce my conclusions to them, believing that they will carry the same weight in their estimation as attaches to a legal promulgation. I shall issue no order, therefore, under the statute, provided the respondents shall, within the next sixty days, furnish me satisfactory evidence that they have carried the above suggestions into operation.
Judgment entered accordingly.*

 The distinction intended may be illustrated thus: if the cause were before a jury, the testimony of the insane person, if competent, would be sufficient to entitle the party adducing it to go to the jury; but not without corroboration would it be sufficient, even if uncontradicted, to entitle him to a direction of a verdict or to anon suit.

 See also, Cross v. Kent, 32 Md. 581. But lie is only liable in actual damages. So far as lie is irresponsible for intent he is not liable-to punitive or exemplary damages. Krom v. Schoonmaker, 3 Barb. 647.

 The following order was subsequently issued :
The People of the State of New York,
To the governors of the society of the New York Hospital, greeting.
Whereas, it has been made to appear to me, John Oi'dronaux, State commissioner in lunacy, by a personal and official inspection, that there is need of a better supervision of the attendants employed to take charge of the insane in the Bloomingdale asylum than can be exercised by the medical staff of that institution; and, whereas, in a. certain judgment rendered by me against the society aforesaid on December 12, 1876, copies of which were duly served on the officers, thereof, the above-mentioned need of a better supervision of attendants was pointed out, and the issuing of an order by me, commanding, the same to be done forthwith, was deferred for sixty days, to allow the governors of said society a reasonable time in which to accomplish it.
Nevertheless, you, the said governors, well knowing the premises, but not regarding your duty in this behalf, have absolutely neglected and refused, and still do absolutely neglect and refuse to comply *273 with the requirements of your duty as pointed out in the judgment, above referred to.
We, therefore, by virtue of the power and authority specially vested in our office by statute, do command you, in the name of the people-of the State of New York, that you appoint within ten days from the date hereof, a competent and suitable man to act as supervisor of attendants in the male department of Bloomingdale asylum, and a competent and suitable woman to act as supervisor in the female department of said asylum, said supervisor in each department not to be at the same time an attendant therein, nor having any other duties to perform than those of supervision, of enforcing the orders of superior officers and of bearing communications from the insane patients to the medical or other officers of the institution.
And we further command you, in the name of the people of the State of New York, that within ten days from the date hereof, you; make return and report in writing to me at my office, No. 271 Broadway, in the city of New York, of the manner in which this order shall have been executed by you.
And whereas, also, there has been in the government of the Bloomingdale asylum a total omission to obey the provisions of section 4 of-article 1 of title 1 of chap. 446 of the Lems of 1874, requiring special', entries to be made from time to time of the physical and mental states-of patients in any asylum in this State, in a book duly kept for that purpose; and which said omission has been going on for nearly three-years, in violation of the statute in such case made and provided.
We, therefore, by virtue of the power and authority specially vested; in our office by statute, do command you, in the name of the people-of the State of New York, that you procure within ten days from the date hereof, a suitable record book in which to carry out and fully-perform the requirements of said statute, and that you cause said record book to be fully inspected at least once in every month by the asylum committee of your said board as among the other duties-assigned them. And we further command you, in the name of the people of the State of New York, that within ten days from the date hereof, you make due return and report in writing to me at my said office, No. 271 Broadway, in the city of New York, of the manner in; which this order shall have been executed by you.
[Signatu/re and seed of State commissioner.],